**Jerry SUSSMAN and Nicholas J. Burgess, Plaintiffs,**

v.

**Donna TANOUE, Chairperson, Federal Deposit Insurance Corporation, Defendant.**

**No. Civ.A. 97–0321(AER).**

United States District Court, District of Columbia.

Feb. 4, 1999.

**16**

John W. Montgomery, Arlington, VA, for Jerry Sussman, Nicholas J. Burgess.

Brian J. Sonfield, Assistant U.S. Attorney, Civil Division, Washington, D.C., for Ricki Tigert Helfer.

### OPINION

AUBREY E. ROBINSON, Jr., District Judge.

Presently before the Court are cross-motions for summary judgment and Plaintiffs' motion to unseal. The Court has considered the pleadings carefully and, for the reasons stated below, the Court will grant Defendant's motion for summary judgment on Counts Three, Four, and Seven, and deny the other pending motions, including Plaintiffs' motion to unseal.

### I. Background

Plaintiffs filed a seven count First Amended Complaint seeking to vindicate their rights under Title VII of the Civil Rights Act of 1964 and other federal laws. Count One, which alleged misclassification of their positions in violation of the Administrative Procedures Act (APA) was dismissed. Count Six is a request for an injunction against further discrimination, which the Court finds inappropriate to decide at this time. The grounds for the remaining counts are described below.

Plaintiffs are white males who work in the FOIA unit of the Federal Deposit Insurance Corporation (FDIC). At the beginning of their FDIC employment, the two were detailed to the FOIA unit of the Resolution Trust Corporation (RTC), but since January 1996 they have worked at FDIC headquarters. The positions Plaintiffs currently occupy are not attorney positions, but they are supervised by a Senior Attorney. In addition, Plaintiff Sussman is an attorney, and has acted at times as Acting Senior Attorney.

Plaintiffs were hired in 1991 at Grade 13, and have remained at Grade 13 ever since. Plaintiffs believe their work deserves a higher grade, particularly in comparison to other FOIA personnel. While working at the RTC in 1993, Plaintiffs sought a "desk audit" of their responsibilities in an effort to be promoted to Grade 14 or higher. The results of the desk audit confirmed Plaintiffs' positions at Grade 13. Count Two of the First Amended Complaint alleges that Plaintiffs position were misclassified as a result of discrimination against white males.

In 1992, 1996, and 1997, the FDIC posted an opening for the Senior Attorney position. Plaintiff Sussman applied for the position each time. In 1992 he was found qualified but was not selected. In 1996 and 1997 he was not found to be qualified for the position. Sussman alleges in Count Three he was rejected for the 1996 opening because of discrimination against white males within the FDIC. He alleges in Count Four that he was rejected in 1997 in retaliation for alleging that discrimination.

Plaintiffs allege in Count Five that since their return to the FDIC in 1996, their supervisors have taken adverse and harassing actions against them, and that these actions were taken in retaliation for Plaintiffs' protected equal employment opportunity (EEO) activities.[1] The alleged retaliatory actions include undeservedly low performance appraisals, denial of performance awards, weakened position descriptions, and various lesser incidents.

Finally, in Count Seven, Plaintiffs allege that the FDIC's affirmative action program creates illegal quotas for the promotion of women and minorities within the FDIC, making it difficult for white males to get promoted.

Defendant has sought summary judgment on all counts. Plaintiffs have sought summary judgment on Counts Two, Five and Seven.

## II. Analysis

### A. Standard of Review for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that the Court should grant summary judgment in favor of a party if "the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In deciding motions for summary judgment all inferences must be viewed in the light most favorable to the non-moving party. *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Id.*

■ The Court approaches summary judgment in discrimination and retaliation cases with acute awareness that plaintiffs need not prove their case by direct evi-

dence. *See United States Postal Serv. v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Rather, plaintiffs are entitled to rely on the three-step *McDonnell Douglas* framework. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288–89 (D.C.Cir.1998) (en banc).

■ Summary judgment, however, is appropriate where the plaintiff relies on "purely conclusory allegations of discrimination." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (citations omitted).

### B. Count Two: Discrimination Through Misclassification of Positions

■ Count Two of the First Amended Complaint alleges that the RTC refused to properly classify Plaintiffs' positions because Plaintiffs were white males. Both sides seek summary judgment on this count.

Plaintiffs contend that they were entitled to hold their positions at least Grade 14, if not Grade 15, while they were employed by the RTC, and after they returned to the FDIC. Plaintiffs believe that a desk audit of their RTC positions was unsuccessful in upgrading their positions because of discrimination against white males.

Defendant contends that Plaintiffs were not given Grade 14 positions because no non-supervisory FOIA personnel at RTC held Grade 14 positions, and therefore it would require changing the entire salary structure of the FOIA unit to accommo-

---

1. Beginning in 1994, Plaintiffs had filed several discrimination complaints against the RTC with the Equal Employment Opportunity Commission (EEOC).

date Plaintiffs' desire for Grade 14 positions.

Based on the parties' Local Rule 108 statements, the Court finds that there is a genuine issue of material fact as to whether Plaintiffs' positions should have been graded higher than Grade 13, and whether the failure to do so was based on a discriminatory motive.[2] Accordingly, the Court will deny summary judgment on Count Two.

### C. Count Three: Discrimination Through Failure To Promote

■ Count Three of the First Amended Complaint alleges that the FDIC refused to hire Plaintiff Sussman in November 1996 for the position of Senior Attorney because he was a white male. Defendant seeks summary judgment on this count.

■ Defendant argues that Plaintiff Sussman cannot make out a *prima facie* case of discrimination because Sussman was not qualified for the Senior Attorney position.[3] *See* Def.'s Mot. for Summ.J. at 17. Alternatively, Defendant argues that it has presented a legitimate nondiscriminatory explanation for the decision not to promote Sussman, and Sussman has failed to provide sufficient evidence of discriminatory motive to survive summary judgment.

Sussman argues that he had been found qualified for the position in 1992 and that, if he was not qualified in 1996, it was only because the position description was re-

written to preclude him for competing for the position.

The Court finds that Sussman was not qualified for the position, and therefore he cannot make out a *prima facie* case.[4] The Senior Attorney position posting required:

4 years of progressively responsible legal experience which demonstrates that [the applicants] have the knowledge, skills, and abilities required to perform the duties of the position and possess the relevant selective factors referred to below. At least one year of professional experience must have been at a level of difficulty and responsibility comparable to the next lower grade level in the Federal Service.

Pls.' Opp. to Def.'s Mot. for Summ.J., Ex. 42.

Defendant argues that Sussman did not meet this requirement. *See* Def.'s Mot. for Summ.J., Ex. 12 (contemporaneous letter from Gregory Myles to Sussman informing Sussman he was being rejected for lack of legal experience; sworn affidavit of Gregory Myles attesting that Sussman was rejected for lack of adequate relevant legal experience). Sussman believes that he did have the adequate legal experience, pointing to a period of five years when he served as Acting Senior Attorney during temporary absences of the Senior Attorney, as well as five years in private practice.

The Court is left with Plaintiff's unsupported assertion that his periodic fill-ins as Acting Senior Attorney, together with his

---

2. Defendant argues that Count Two, alleging misclassification in violation of Title VII, has been essentially resolved because Count One, alleging misclassification in violation of the APA, was dismissed. *See* Def.'s Resp. to Pls.' Statement of Material Facts Not in Dispute at ¶¶ 7–10. The Court finds this suggestion more than a little disinguous since Defendant's motion to dismiss Count One rested in part on the argument that Title VII represented Plaintiffs' sole remedy for misclassification. *See* Def.'s Partial Mot. to Dismiss at 4.

3. A *prima facie* case of "reverse" discrimination is made out when a plaintiff shows: he

applied for a job; was qualified for the job; was rejected in favor of another applicant; and there is reason to suspect that "the defendant is that unusual employer who discriminates against the majority." *Harding v. Gray*, 9 F.3d 150, 152–153 (D.C.Cir.1993) (quoting *Parker v. Baltimore & Ohio R.R.*, 652 F.2d 1012, 1017 (D.C.Cir.1981)).

4. Another potential barrier to Sussman's *prima facie* case is the requirement to show sufficient "background circumstances" to raise the inference that the FDIC was discriminating against white employees. *See Harding*, 9 F.3d at 153.

time in a generalist private practice, is equivalent to four years of FOIA legal experience, including a year of Grade 13 experience. This evidence is insufficient for Plaintiff to establish that he had sufficient relevant legal experience. Therefore, the Court finds that Plaintiff has not made out his *prima facie* case.

In an effort, however, to grant Sussman the benefit of every doubt, the Court will assume he has made out a *prima facie* case, will treat the question of inadequate legal experience as a non-discriminatory explanation, and will proceed to consider whether Sussman has any evidence of pretext to undermine Defendant's nondiscriminatory explanation for the decision not to select him for the position.

The Court of Appeals has recently attempted to clarify what is required of a plaintiff at this stage,

> Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C.Cir.1998) (en banc).

5. The Court finds it unnecessary to consider Defendant's suggestion that Plaintiff's qualification for the position in 1992 may have been a mistake. *See* Supp.Decl. of Gregory S. Myles at ¶ 4.

6. Plaintiff appears to suggest that it is Defendant's responsibility to explain why Sussman's legal experience was not adequate to

In this case, the only evidence Plaintiff Sussman has to attack Defendant's proffered nondiscriminatory reason are the facts that: 1) he has legal experience which he believes should be sufficient to meet the requirements of the Senior Attorney position; 2) he was found qualified for the position when it was posted in 1992; and 3) William Tricarico, a former manager at both the RTC and FDIC, believes Sussman was capable of doing the job.

The Court finds that this evidence is insufficient to survive summary judgment. A court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.' ... Title VII liability cannot rest solely on a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates." *Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C.Cir.1982)). The fact that Sussman was found qualified for the position in 1992 is not sufficient evidence to allow a trier of fact to infer that the required qualifications in the 1996 posting were pretextual. There could be a myriad of good reasons why the agency changed its requirements over the intervening four years to require four years of relevant legal experience, rather than merely one year of relevant specialized experience.[5]

Likewise the Court does not find any basis in the record on which a trier of fact could second-guess the FDIC's decision that Sussman's legal experience did not satisfy the requirements of the posting, and no basis to conclude that the agency's determination was pretextual.[6]

satisfy the requirements of the position. *See* Pls.' Opp. to Def.'s Mot. for Summ.J. at 13. The burden, however rests on Plaintiff. Either Plaintiff must show he was qualified as part of establishing his *prima facie* case, or else, once Defendant has proffered the explanation of insufficient relevant legal experience, Plaintiff must come forward with evi-

■■■ Even if the Court goes so far as to assume that Sussman met the posted requirements, and also credits Tricarico's statement, Sussman is then only in the position of the plaintiff in *Fischbach, i.e.,* one qualified candidate passed over in favor of another qualified candidate of a different racial or gender group. But that fact alone is not enough to get to a jury on a claim of discrimination, especially since there is no record evidence that Sussman was *more* qualified than the other candidates. *See Aka,* 156 F.3d at 1295 (plaintiff attacking a qualifications-based explanation should compare her qualifications to those of the successful candidate, or offer other evidence exposing flaws in employer's explanation).

There is simply not enough evidence in this record to enable a trier of fact to conclude that Defendant's explanation for the selection decision was a pretext for discrimination. Accordingly, the Court will grant summary judgment for Defendant on Count Three.

### D. Count Four: Retaliation Through Failure to Promote

Count Four of the First Amended Complaint alleges that the FDIC refused to hire Plaintiff Sussman in September 1997 for the position of Senior Attorney "in retaliation for his having previously filed administrative complaints of discrimination, and in retaliation for his having filed this lawsuit." 1st Am.Compl. at ¶ 75. Defendant seeks summary judgment on this count.

■■■■ To establish a *prima facie* case of retaliation through failure to promote, a plaintiff must show: 1) that she engaged in protected activity; 2) that she was qualified for the position; 3) that she did not receive the promotion; and 4) that a causal connection exists between the protected activity and the failure to promote. *Mitchell v. Baldrige,* 759 F.2d 80, 86 & n. 5 (D.C.Cir.1985). Once the *prima facie* case is established, a retaliation claim follows the general pattern of *McDonnell Douglas. Id.* at 87.

■■■ The Court finds, for the reasons already stated, that Plaintiff Sussman is unable to show that he was qualified for the position because he lacked the requisite relevant legal experience.[7] Therefore, Sussman cannot make out a *prima facie* case.[8]

■■■ The Court is, however, again willing to assume Sussman has made out a *prima facie* case. On that assumption, the Court finds that Defendant has proffered a legitimate nondiscriminatory reason for Sussman's non-selection for the Senior Attorney position in that he lacked sufficient relevant legal experience.[9]

Again, Sussman has presented no evidence that Defendant's decision he was not qualified was pretextual, or motivated by retaliatory intent. Plaintiff resorts to an attempt to manufacture an inference, arguing that since the FDIC personnel specialists did not swear under oath they treated his application the same as everyone else's, it follows that they must have been pressured to reject his application. This argument simply is not evidence of any kind, and, in any case, Defendant has submitted supplemental affidavits to make it clear

---

dence suggesting that proffered explanation is pretextual. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

7. The 1997 position announcement for Senior Attorney contained the same requirement of four years of relevant legal experience.

8. The Court also notes that at least one person who decided Sussman was unqualified was completely unaware of his EEO activity

at the time. *See* Decl. Of Frank W. Aaron at ¶¶ 5–6. Thus, Plaintiff might also be unable to establish the causal connection requirement of a *prima facie* case.

9. Defendant has presented evidence that four different personnel specialists examined Sussman's application and all concluded that he lacked sufficient relevant legal experience. *See* Decl. of Frank W. Hunger at ¶¶ 4–8.

that the argument lacks any basis in fact. *See* Supp.Decl. of Gregory S. Myles; Supp. Decl. of Frank Aaron.

Thus, it appears that Sussman was not qualified for the position, and there is no basis in the record to allow a trier of fact to conclude that the FDIC's decision that he was not qualified, and the ultimate decision not to select him, were the result of retaliation. Accordingly, the Court will grant summary judgment for the Defendant on Court Four.

### E. Count Five: Retaliation Through Harassment and Changes in Position Description

Count Five of the Amended Complaint alleges that Plaintiffs have been subjected since 1995 to "harassment, unwonted criticism of their work, and other adverse actions by persons in positions senior to them at the RTC and FDIC, in retaliation for the discrimination complaints they filed . . . ." 1st Am.Compl. at ¶ 79. Both parties seek summary judgment on this count.

 Plaintiffs point to a number of incidents to establish Defendant's liability for retaliatory harassment. Several of the incidents involve no more than a supervisor following, or attempting to follow, agency procedures, and do not appear to have caused Plaintiffs any real harm. The Court doubts that these incidents, standing alone, could serve as the basis for a retaliation claim under Title VII. *See Taylor v. FDIC*, 132 F.3d 753, 765 (D.C.Cir.1997) ("The federal courts cannot be wheeled into action for every workplace slight, even one that was possibly based on protected conduct.").

In addition, however, Plaintiffs allege that they have been given undeservedly low performance appraisals, been denied performance awards, that their position descriptions were weakened upon their transfer from the RTC to the FDIC, and

that these actions were taken in retaliation for their EEO activities.

Defendant has argued that Plaintiffs may not complain about the denial of performance awards because they pursued administrative redress only for the 1995 performance award, and they ultimately received a 1995 award, albeit in 1996 and only after filing a formal retaliation complaint.

The Court, however, construes Burgess's administrative complaint of December 1995 as complaining about the denial of financial awards during 1994 and 1995 (for work performed during 1993 and 1994).[10] Thus, at least the 1994 performance award appears to be properly before the Court, if exhaustion of remedies is required.

 In addition, most courts have concluded that plaintiffs are not required to exhaust administrative remedies for claims of retaliation which arise following the filing of administrative complaints. *See Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir.1992). This holding makes sense from both a practical and a policy view, and is fully consistent with the requirement of our Court of Appeals that, "[a]t a minimum, the Title VII claims must arise from the 'administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C.Cir.1995) (quoting *Chisholm v. United States Postal Service*, 665 F.2d 482, 491 (4th Cir.1981)).

In addition, the fact that Plaintiffs eventually received performance awards for the 1995 cycle may be of little relevance in deciding liability for the initial denial of award, although it is relevant to the damages Plaintiffs could recover. *See Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1555 (D.C.Cir.1997).

Defendant has not addressed the question of the allegedly low appraisals, and

---

**10.** The Court sees no basis in Burgess's administrative complaint for the distinction Defendant makes between the basis of the complaint and the remedy sought.

has not demonstrated the absence of material fact on the questions of whether Plaintiffs' position descriptions were unnecessarily weakened on their return to FDIC, and whether any changes to the position descriptions were sufficiently harmful to constitute adverse personnel action. Furthermore, Defendant has not provided a legitimate nondiscriminatory reason to rebut Plaintiffs' *prima facie* case concerning the performance awards.

■ At the same time, the Court finds that a reasonable jury could conclude from the record that no retaliation was taken against Plaintiffs. Taking the evidence as a whole, the Court finds that there is a genuine issue of material fact as to whether Plaintiffs suffered adverse actions, and whether those actions were motivated by retaliation for engaging in protected activity. Accordingly, the Court will deny summary judgment on Count Five.[11]

### F. Count Seven: Discrimination through FDIC's Affirmative Action Program

#### 1. Factual Background

Count Seven of the First Amended Complaint alleges that the FDIC is implementing an affirmative action program which "calls for promotion quotas for women and minorities at the expense of white males." 1st Am.Compl. at ¶ 85. The parties agree that this count is ripe for summary judgment.

Defendant has filed a Statement of Material Facts not in Dispute pursuant to Local Rule 108. Defendant's statement asserts, with appropriate references to the record, the following facts:

1) the FDIC collects "statistical information on the racial and gender make-up of its workforce ... The purpose of this enterprise is to promote fairness at the FDIC and ensure that the agency is in compliance with all applicable anti-discrimination laws ." Def.'s Statement of Material Facts not in Dispute at ¶ 30;

2) the FDIC compares the representation of various racial and gender groups in specific FDIC job series with the civilian labor force. If the representation in the FDIC job series is below 25% of the representation in the civilian labor force, then the agency notes it is experiencing a "conspicuous absence" of representation. If the agency representation is between 25% and 49%, then the agency notes it is experiencing a "manifest imbalance" in representation of that job series. *Id.* at ¶ 31;

3) the FDIC's Affirmative Employment and Counseling Section tracks all promotion and hiring decisions in order to ensure that the agency is complying with all applicable anti-discrimination laws. This office, however, "does not have any authority to compel a particular hiring decision." *Id.* at ¶ 33; and

4) the FDIC affirmative action program "does not require or endorse—and FDIC does not use—any sort of 'quotas,' preferential hiring, or any other sort of 'reverse discrimination' in connection with either hiring or promotion." *Id.* at ¶ 34.

Plaintiffs have declined to contest the factual accuracy of Defendant's Statement of Material Facts not in Dispute. *See* Pls.' Mem. in Oppos. to Def.'s Mot. for Summ.J. at 23–24 ("summary judgment on [count seven] is certainly appropriate. There is no dispute as to the evidence, the parties simply disagree on the law that applies to it."). Instead, Plaintiffs characterize each assertion of Defendant's statement as stat-

---

11. The Court will accept Plaintiffs' suggestion to reserve judgment on the scope of the evidence Plaintiffs may introduce at trial in an effort to demonstrate retaliation. *See* Pls.' Opp. to Def.'s Mot. for Summ.J. at 18; *compare Taylor v. FDIC*, 132 F.3d 753, 765 (D.C.Cir.1997) (some workplace slights too minor to be actionable under Title VII) *with*

*Hayes v. Shalala*, 902 F.Supp. 259, 267 (D.D.C.1995) (plaintiff should be allowed to argue to jury that "totality of actions taken by his employer created a harassing and retaliatory environment" even if specific actions taken individually were not sufficient to constitute retaliation).

ing "a legal conclusion rather than a fact." Pls.' Statement of Material Facts as to Which There Exist Genuine Issues at ¶¶ 7, 8, 9. Therefore, while Plaintiffs assert that Defendant's statement is "untrue," Plaintiffs decline to provide any record cites in support of their position.

The Court fails to understand how statements such as "[t]he FDIC Affirmative Action Plan does not require or endorse—and FDIC does not use—any sort of 'quotas' " could be construed as a legal conclusion rather than a factual assertion. The Court can only conclude that Plaintiffs have made a deliberate decision to seek summary judgment on this count and have chosen therefore not to allege the existence of disputed issues of material fact.

■ This Circuit takes the Local Rule 108 statement very seriously as an aid to "decid[ing] motions for summary judgment efficiently and effectively." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C.Cir. 1996). "Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes." *Id.* (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C.Cir.1980)). When counsel fails "to identify the pertinent parts of the record, to isolate the facts that are deemed to be material, and to distinguish those facts which are disputed from those that are undisputed ... he may not be heard to complain that the district court abused its discretion by failing to compensate for counsel's inadequate effort." *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C.Cir.1988).

Accordingly, even if the failure to identify in the record the basis for Plaintiffs' disagreement with Defendant's characterization of the affirmative action program was inadvertent, rather than deliberate, the Court would still accept Defendant's statement as true.

Plaintiffs have themselves filed a Local Rule 108 statement, which does include record citations. Plaintiffs' statement alleges, with appropriate record references, the following facts about the FDIC's affirmative action plan:

1) the plan "and associated programs and policies are race-conscious, and are intended to help women and minorities as opposed to white males." Pls.' Statement of Facts as to Which There is No Material Dispute at ¶ 2;

2) the program relies on " 'action items,' the purpose of which is to try to increase the representation of certain groups in certain jobs." *Id.* at ¶ 4; and

3) the FDIC has never tried to increase the representation of white men in any job series. *Id.* at ¶ 5.

Defendant has filed a properly supported response to this statement. Defendant admits that the program has "action items" where there is a manifest imbalance or conspicuous absence of representation as compared to the civilian labor force. Defendant denies that "action items" constitute, or lead to, quotas or preferential treatment. Def.'s Resp. to Pls.' Statement of Material Facts as to Which There is No Material Dispute at ¶ 4. Defendant also denies that the affirmative action program is intended to solely benefit women and minorities, but argues that this fact is not material. *Id.* at ¶¶ 2, 5.

In support of their statement that the plan's "action items" were intended to increase representation of "certain groups in certain jobs," Plaintiffs cite to a portion of the Valentin Deposition. Nothing in this portion of the record, however, indicates that representation was to be increased through the use of quotas or preferential treatment. If anything, the agency's efforts seemed to be directed to discovering and eliminating "artificial barriers" which resulted in under-representation of specific groups in specific jobs. Valentin Depo. p. 33, 11. 20–21.

Thus, there is nothing in Plaintiff's Local Rule 108 statement which undermines Defendant's statement that the FDIC's affirmative action does not use quotas or

lead to preferential treatment. Accordingly, the Court will accept as true Defendant's statement of material facts, but will also credit the Local Rule 108 statement filed by Plaintiffs.[12]

### 2. Analysis

#### a. Standing

 Defendant suggests that Plaintiffs lack standing to challenge the affirmative action program. If the Court were to construe Plaintiffs' Complaint as a challenge to how the FDIC recruits new employees and trains its managers, then the Court agrees that Plaintiffs would probably lack standing. The Court finds, however, that Plaintiffs' Complaint is addressed to the alleged effect of the affirmative program on promotion practices within the FDIC. See 1st Am.Compl. at ¶ 85; Pls.' Reply Brief in Support of Partial Mot. for Summ.J. at 11 ("[Plaintiffs] did not bring this case to challenge the FDIC's external recruiting and hiring practices. Plaintiffs have charged the FDIC with discriminating against current white male employees, including themselves, and that is what their evidence is directed against.").

The Court is satisfied that Plaintiffs have sought promotions within FDIC and were not promoted. Plaintiffs' allegation is that the affirmative action program made it more difficult for them to get promoted, and the Court agrees that they have standing to raise this claim. See Northeastern Florida Contractors v. City of Jacksonville, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (plain-

tiff challenging a set-aside program has standing if it alleges a willingness to bid on contracts and that the program prevents it from competing on an equal basis); Dynalantic Corp. v. Department of Defense, 115 F.3d 1012, 1016 (D.C.Cir.1997) (same).

#### b. Standard of Review

 Plaintiffs contend that the affirmative program should be evaluated under the Equal Protection clause, and the strict scrutiny which the Supreme Court has recently used in evaluating government-sponsored race-based set-aside programs.[13] See Adarand Constructors Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); Richmond v. J.A. Croson Co., 488 U.S. 469, 493–94, 109 S.Ct. 706, 102 L.Ed.2d 854. (1989).

Defendant contends that the FDIC's affirmative program is subject to the less stringent scrutiny associated with private affirmative action programs which are voluntarily adopted under Title VII. See Johnson v. Transportation Agency, 480 U.S. 616, 628–32, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987); United Steelworkers v. Weber, 443 U.S. 193, 208, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). In the alternative, Defendant contends that the FDIC's affirmative action activities are so limited in scope that they do not violate the Equal Protection Clause.

It is not entirely clear whether government agencies which voluntarily adopt affirmative action programs are entitled to the more generous standard of review of Title VII. See Stewart v. Rubin, 948

---

12. The Court notes that Defendant does not concede that the affirmative action program is not intended to benefit underrepresented white males. See Valentin Depo. at pp. 29–32. The Court agrees with Defendant, however, that this fact is not material. Accordingly, the Court will assume for the purposes of this Opinion that the affirmative action program is intended only to increase representation of minorities and women.

13. Technically, only the Due Process Clause of the Fifth Amendment, and not the Equal

Protection Clause of the Fourteenth Amendment, applies to the federal government. The Supreme Court, however, has held that the requirements of the two, at least in this context, are coextensive. See Adarand Constructors Inc. v. Pena, 515 U.S. 200, 217–18, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). In an effort to avoid unnecessary confusion, the Court will simply refer to Equal Protection jurisprudence when discussing the constitutional obligations of FDIC.

F.Supp. 1077, 1095 (D.D.C.1996) (Lamberth, J.) (noting issue but finding it unnecessary to decide because settlement satisfied both standards) *aff'd* 124 F.3d 1309 (D.C.Cir.1997). Like Judge Lamberth, this Court finds it unnecessary to decide the issue, because the FDIC's affirmative action plan does not allocate benefits on the basis of race or gender, and therefore does not trigger strict scrutiny.

### c. Constitutional requirements for non-set-aside affirmative action programs

As noted above, the affirmative action activity by FDIC consists of: (1) collecting data about the racial and gender make-up of the FDIC workforce; (2) noting where dramatic statistical disparities with the civilian labor force exist; and (3) making efforts to reduce the disparities through monitoring and elimination of artificial barriers, but without granting preferential treatment to any person on account of race or gender.

Courts have not found requirements to collect data about the racial and gender make-up of a workforce to violate the Constitution. *See Caulfield v. Board of Education*, 583 F.2d 605, 611–12 (2d Cir.1978); *United States v. New Hampshire*, 539 F.2d 277, 280 (1st Cir.1976). As the First Circuit said,

> Statistical information as such is a rather neutral entity which only becomes meaningful when it is interpreted. And any positive steps which the United States might subsequently take as a result of its interpretation of the data in question remain subject to law and judicial scrutiny.

*United States v. New Hampshire*, 539 F.2d at 280. Thus the Court will consider whether the uses of the data here by FDIC give rise to a constitutional violation.

The data in this case was used to identify job series where certain racial and gender groups were dramatically underrepresented as compared to the civilian labor force. The FDIC's Affirmative Employment and Counseling Section then tracks all promotion and hiring decisions in an effort to ensure that the agency is complying with all applicable anti-discrimination laws. *See e.g.*, 42 U.S.C. § 2000e–16; Exec. Order No. 11,478, 34 Fed.Reg. 12985, *reprinted as amended* at 42 U.S.C.A. § 2000e note (1988). The Affirmative Employment and Counseling Section attempts to find ways to reduce under-representation of specific groups in specific jobs. However, this office lacks any authority over the hiring process and the FDIC does not use quotas or preferential hiring for any position.

In short, the FDIC has taken steps to ensure that no person is denied equal employment opportunity with the agency, but the agency does not give any specific group or person a preference in hiring.

Courts have consistently declined to apply strict scrutiny to outreach efforts to minorities which do not accompany actual preferences. *See Duffy v. Wolle*, 123 F.3d 1026, 1038–39 (8th Cir.1997) ("An employer's affirmative efforts to recruit female and minority applicants does not constitute discrimination."); *Ensley Branch NAACP v. Seibels*, 31 F.3d 1548, 1571 (11th Cir. 1994) (describing efforts to actively encourage Blacks to apply for jobs, including waivers of application fees, as "race-neutral"); *Billish v. City of Chicago*, 962 F.2d 1269, 1290 (7th Cir.1992) (describing aggressive recruiting as "race-neutral procedures") *rev'd on other grounds*, 989 F.2d 890 (7th Cir.1993) (en banc); *Shuford v. Alabama State Bd. of Educ.*, 897 F.Supp. 1535, 1552 (M.D.Ala.1995) (efforts to include more qualified candidates in the pool "do not require the traditional Title VII and equal protection analysis"); *cf. South–Suburban Housing Ctr. v. Greater South Suburban Board of Realtors*, 935 F.2d 868, 883–84 (7th Cir.1991) (no violation of the Fair Housing Act where real estate agent agreed to make special efforts to market home to white home buyers

where home would not normally be of interest to white home buyers).

Our own Court of Appeals has recently addressed this question in a slightly different context. In *Lutheran Church–Missouri Synod v. FCC,* 141 F.3d 344 (D.C.Cir.) *reh'g denied,* 154 F.3d 487 (D.C.Cir.), *and reh'g en banc denied* 154 F.3d 494 (D.C.Cir.1998), the Court of Appeals held that FCC regulations which provided strong incentives for radio station owners to grant racial preferences in hiring were subject to strict scrutiny. 141 F.3d at 351; *see also* 154 F.3d at 491 (denial of petition for rehearing) ("Because the FCC's regulations at issue here indisputably pressure—even if they do not explicitly direct or require—stations to make race-based hiring decisions, under the logic of *Adarand* they too must be subjected to strict scrutiny").

At the same time, the Court of Appeals was careful to note that it was *not* holding that outreach efforts alone would require strict scrutiny. *Lutheran Church,* 141 F.3d at 351; *see also* 154 F.3d at 492 (denial of petition for rehearing) (it is not the case "that any regulation encouraging broad outreach to, as opposed to the actual hiring of, a particular race would necessarily trigger strict scrutiny … We of course do not claim … that all race conscious measures adopted by the government must be subjected to strict scrutiny.")

Superficially, the program of the FDIC looks somewhat similar to the affirmative action activities required by the FCC under the regulations struck down in *Lutheran Church.* In both cases, the employer is supposed to compare the racial and gender composition of its workforce with the local labor force. If the comparison indicates under-representation of certain groups, which for the FDIC must be significant, the employer is supposed to examine its personnel practices to ensure that they do not inadvertently reduce employment opportunities for any group. *See Lutheran Church,* 141 F.3d at 352 (quoting EEO

guidelines published at 47 C.F.R. § 72.2080(c)).

There is, however, a critical difference between the FDIC's program and the FCC regulations struck down in *Lutheran Church.* The reason the *Lutheran Church* court decided to apply strict scrutiny was its conclusion that, notwithstanding the FCC's arguments to the contrary, the FCC EEO guidelines would inevitably create pressure on stations to eliminate under-representation through racial preferences in hiring. *Lutheran Church,* 141 F.3d at 351 ("the EEO regulations before us extend beyond outreach and certainly influence ultimate hiring decisions"); 141 F.3d at 352 ("Nor can it be said that the Commission's parity goals do not pressure license holders to engage in race-conscious hiring"); 141 F.3d at 353 ("It cannot seriously be argued that this screening device does not create a strong incentive to meet the numerical goals"); 154 F.3d at 491 (denial of petition for rehearing) ("we held that the FCC's EEO regulations … inevitably cause licensees to grant racial preferences").

By contrast, in this case, there is record evidence that the FDIC's affirmative action program does *not* lead to racial preferences in hiring, and Plaintiffs have pointed to no evidence to the contrary. The FDIC's Affirmative Employment and Counseling Section has no authority comparable to the threat of extended government audit, license denial, and forfeiture which the Court of Appeals found would inevitably convert a potential concern about under-representation on the part of the FCC and the licensee into a hiring preference. The FDIC's Affirmative Employment and Counseling Section has absolutely no authority over hiring—its role is only to identify potential problems. Thus, the inference that the affirmative action program leads to racial preferences in hiring decisions simply is not present in this action.[14] *Cf. Lutheran Church,* 141 F.3d at 351.

---

**14.** Of course, to the extent that Plaintiffs are arguing that they were denied promotions

Rather, the program in this case falls within the category of programs, those conscious of race but devoid of ultimate preferences, which have been consistently upheld by courts. *See Lutheran Church,* 154 F.3d at 500 (Tatel, C.J., dissenting from the denial of rehearing en banc) ("neither the Supreme Court nor any other court has ever applied strict scrutiny to programs that require nothing more than recruitment, outreach, self-evaluation, and data collection"); *Duffy v. Wolle,* 123 F.3d 1026, 1038–39 (8th Cir.1997); *Ensley Branch NAACP v. Seibels,* 31 F.3d 1548, 1571 (11th Cir.1994); *Shuford v. Alabama State Bd. of Educ.,* 897 F.Supp. 1535, 1552 (M.D.Ala.1995).

As the Eighth Circuit noted,

An inclusive recruitment effort enables employers to generate the largest pool of qualified applicants and helps ensure that women and minorities are not discriminatorily excluded from employment ... The only harm to white males is that they must compete against a larger pool of qualified applicants. This, of course, "is not an appropriate objection" and does not state a cognizable harm.

*Duffy,* 123 F.3d at 1039 (quoting *Shuford,* 897 F.Supp. at 1553).

Furthermore, the mere fact that the FDIC's affirmative action program includes "action items," or goals to increase the representation of specific groups in specific jobs, does not alter this conclusion. "The question is whether employment goals are selection goals that affect the process of selection or diagnostic goals that measure the efficacy of pool expansion techniques such as affirmative recruitment." *Shuford,* 897 F.Supp. at 1554.

In *Shuford,* a consent decree set out hiring goals for women for a public agency, and required good faith efforts to reach those goals. At the same time, the parties stipulated that the decree did not permit

preferences for women in hiring. Accordingly, the court found that "the goals are merely diagnostic tools that have no selection force of their own ... The goals have a secondary purpose, which is also diagnostic, of suggesting which positions the recruitment efforts should emphasize." *Id.* at 1555. The court concluded that, since the goals were only used as "diagnostic tools for measurement and emphasis," there was no violation of the Equal Protection Clause or Title VII. *Id.*

Likewise, in this case, it is unrebutted that the FDIC affirmative action program "does not require or endorse—and FDIC does not use—any sort of 'quotas,' preferential hiring, or any other sort of 'reverse discrimination' in connection with either hiring or promotion." Def.'s Statement of Material Facts not in Dispute at ¶ 34. It follows that the only purpose of the "action items" is to focus attention on specific jobs, in order to identify possible illegal, discriminatory practices and to monitor progress in eliminating barriers to equal employment opportunity.

This Court agree with the opinion in *Shuford* that "[c]ourts should not place obstacles in the way of attempts to comply with the law and avoid discrimination lawsuits unless required to do so by the [C]onstitution or by statute." *Shuford,* 897 F.Supp. at 1554. The Court finds that the FDIC's affirmative action program does not create preferences in hiring based on race or gender, and therefore need not be examined under strict scrutiny. The Court finds that the program is a reasonable effort to comply with anti-discrimination laws, and is legal under both Title VII and the Constitution. Accordingly, the Court will grant summary judgment on Count Seven in favor of the Defendant.

### G. Plaintiffs' Motion to Unseal

Plaintiffs have also moved to unseal the sealed materials in this case. Plaintiffs do,

---

because of racial preferences implemented by specific managers with authority to hire and promote, that claim has been presented to the Court in a separate count of the First Amend-

ed Complaint. The point here is that the FDIC's affirmative program itself does not create any hiring preferences.

**28**

however, concede that it is appropriate to leave the materials sealed if the Court denies summary judgment on Count Five. *See* Pls.' Reply in Support of Sealed Mot. for Summ.J. at 24. Since the Court has denied summary judgment on Count Five, Plaintiffs appear to consent to maintaining the confidentiality of the sealed documents.

In addition, the Court notes that it is official agency policy to preserve the confidentiality of the records at issue here. *See* Def.'s Sealed Opp., Ex. 4 at 2. Taking this policy into consideration, the Court finds there is good cause to maintain the confidentiality of the sealed materials. *See EEOC v. National Children's Center*, 98 F.3d 1406, 1411 (D.C.Cir.1996). Accordingly, the Court will deny Plaintiffs' motion to unseal.

### III. Conclusion

Plaintiff Sussman has failed to demonstrate that he was qualified for the position of Senior Attorney, or that there is sufficient evidence in the record to allow a jury to conclude that he was found unqualified and denied the position for discriminatory or retaliatory motives. Plaintiffs have also failed to offer any evidence that the FDIC's affirmative action creates racial or gender preferences in personnel actions. Accordingly, the Court will grant Defendant's motion for summary judgment on Counts Three, Four and Seven.

Genuine issues of material fact appear to remain, however, as to the classification of Plaintiffs' positions and the alleged retaliation against Plaintiffs. Therefore the Court will deny summary judgment on Counts Two and Five.

The Court finds there is good cause to maintain the protective order, and will therefore not unseal the sealed materials.