Beth Walter HONADLE, Plaintiff,

v.

The UNIVERSITY OF VERMONT
AND STATE AGRICULTURAL
COLLEGE, Defendant.

No. 2:96CV292.

United States District Court,
D. Vermont.

June 1, 1999.

**420**

Michael Frederick Hanley, Plante, Hanley & Brannen, White River Junction, VT, for Beth Walter Honadle, plaintiff.

Karen McAndrew, Dinse, Knapp & McAndrew, P.C., Burlington, VT, Pamela Heatlie, University of Vermont, Office of the General Counsel, Burlington, VT, for University of Vermont, and State Agricultural College, defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SESSIONS, District Judge.

In this lawsuit alleging reverse racial discrimination in a failure-to-hire case, the parties seek a ruling *in limine* on two issues: 1) whether Plaintiff Beth Walter Honadle would be entitled to instatement in the position she sought should she prevail on her discrimination claims; and 2) whether, if the jury concludes that race was a factor in the hiring decision, Defendant University of Vermont ("UVM") may argue that it acted pursuant to a valid affirmative action plan. An evidentiary hearing was conducted on July 7 through 10, 1998 as to the suitability of instatement and the validity of UVM's affirmative action plan.

## I. FINDINGS OF FACT

1. In 1994, the department of community development and applied economics ("CDAE") was formed out of three existing departments in the College of Agriculture and Life Sciences ("CALS") at the University of Vermont ("UVM").

2. In connection with the formation of this department, CALS conducted a nationwide search for a department chair.

3. The faculty search committee for the position was directed to select three candidates whom it considered qualified and acceptable, to list its perception of each candidate's strengths and weaknesses, and to forward this information to the CALS dean.

4. The committee's three selected candidates were Catherine Halbrendt, Beth Honadle and Thomas Dietz.

5. Dr. Honadle appeared to be the preferred candidate of the search committee; however a search committee's preference, if any, does not determine who is selected for the position.

6. CALS Dean Lawrence Forcier, in consultation with his associate deans Catherine Donnelly and Donald Foss, decided in June of 1995 to offer the position to Dr. Halbrendt. Dr. Honadle was their second choice, and would have been offered the position had Dr. Halbrendt decided not to accept the offer.

7. UVM's official offer of employment to Dr. Halbrendt was dated and accepted August 22, 1995.

8. Catherine Halbrendt is a Chinese-born Asian–American. Beth Honadle is white.

9. Dean Forcier stated that he chose Dr. Halbrendt rather than Dr. Honadle for a number of reasons, but that race or the availability of additional funding for a minority hire was not a factor in the decision.

10. An "Appointment Authorization Form," prepared by Associate Dean Foss and submitted to UVM's Office of Affirmative Action and Equal Opportunity prior to

Dr. Halbrendt's hiring, stated the reasons for her selection as follows: "will enhance diversity many ways—woman, minority, world scholar[;] excellent scholarship and entrepreneurial skills (many grant sources)[;] diverse educational background—will bring social science and biological science faculty and leadership skills—self-starter, gets things done, well organized."

11. When Dr. Honadle learned she was not going to be offered the position she sent several letters protesting the decision: to the dean, to members of the search committee, to the secretaries and department chairs in CALS, to the President and Board of Trustees of UVM, and to Attorney General Janet Reno. In her correspondence she referred to Dr. Halbrendt as "an unqualified oriental," to the hiring decision as "conscience-soothing experimentation," and she threatened legal action. At that time, she had no information as to Dr. Halbrendt's qualifications, professional reputation or expertise, other than second-hand comments from contacts at UVM.

12. Dr. Honadle also provided a *Burlington Free Press* reporter with information which led to a front-page article airing her allegations of reverse discrimination.

13. On September 3, 1996, Dr. Honadle filed suit, claiming that she was wrongfully denied the CDAE chair position on account of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Vermont's Fair Employment Practices Act, Vt.Stat.Ann. tit. 21, § 495 *et seq.* She seeks monetary damages and injunctive relief, specifically that she be installed, with tenure, as chair of CDAE.

14. In addition, Dr. Honadle has challenged the legality of UVM's affirmative action plan under Title VII and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. She seeks a permanent injunction against any act pursuant to its affirmative action program.

15. As a government contractor, UVM must adopt and maintain an affirmative action program ("AAP") designed to promote and insure "equal opportunity for all persons, without regard to race, color, religion, sex, or national origin," in order to maintain its status. 41 C.F.R. § 60–1.1; 1.40; 2.1. The Office of Federal Contract Compliance Programs ("OFCCP") oversees compliance with the federal regulations concerning affirmative action.

16. An AAP is "a set of specific and result-oriented procedures to which a contractor commits itself to apply every good faith effort" to achieve equal opportunity. 41 C.F.R. § 60–2.10. An AAP must include an analysis of areas in which the "contractor is deficient in the utilization of minority groups and women," and "goals and timetables to which the contractor's good faith efforts must be directed to correct the deficiencies." *Id.*

17. "Underutilization" is defined as "having fewer minorities or women in a particular job group than would reasonably be expected by their availability." 41 C.F.R. § 60–2.11.

18. A "utilization analysis," as it is called, generally requires contractors to determine the gender and ethnic/racial composition of employees participating in its workforce by job group, to estimate the availability of qualified individuals in the relevant labor pool, and then to compare these findings to determine whether underutilization exists.

19. If underutilization of women or minorities is found, a contractor must set goals and timetables designed to remedy the deficiency. 41 C.F.R. § 60–2.12.

20. Government contractors may use different methods to define the threshold for underutilization. Underutilization may be determined by analyzing the difference between the actual and the estimated available number of employees for statistical significance under a standard deviation test, or under the 80% rule, where actual

employee numbers must be at least 80% of estimated available employees.

21. The utilization analysis and the setting of goals and timetables is done separately for women and for minorities. The regulations do not require separate goals and timetables for different racial or ethnic groups unless "it comes to the attention of the [OFCCP] that there is a substantial disparity" in the employment of a particular minority group or men or women of a particular minority group. 41 C.F.R. § 60–2.12(1).

22. The regulations stress that the goals are targets, not quotas. 41 C.F.R. § 60–2.12(e).

23. AAPs must be summarized and updated annually. 41 C.F.R. § 60–2.14. UVM's AAPs are revised annually.

24. UVM's AAPs for 1994–1995 and 1995–1996 reflect workforce analyses broken down by minority group and gender. They contain utilization analyses and goals and timetables for minorities and women in underutilized job groups. UVM used detailed occupational data from the 1990 national census Equal Employment Opportunity Special Files to determine the availability of qualified faculty.

25. In the 1994–1995 AAP, UVM identified eleven job groups in which women and/or minorities were underutilized. Women and minorities were underutilized in the job group which included the CDAE chair position ("job group 701"). Of the 197 professors included in this job group, two were minorities. According to UVM's "availability analysis," the expected number of minority faculty in this group was eleven.

26. In the 1995–1996 AAP, UVM identified twelve job groups in which women and/or minorities were underutilized. Again women and minorities were underutilized in job group 701. Of the 197 professors in the job group, three were minorities. The expected number of minority faculty in this group again was eleven.

27. The difference between the actual and expected number of minority faculty members in job group 701 was statistically significant using a two standard deviation test or using the 80% rule.

28. As of the 1994–1995 AAP year, the two minority professors in job group 701 were Asian men. The number of Asian professors theoretically available was eight, based on a national availability estimate of 4.13%.

29. As of the 1995–1996 AAP year, the three minority professors in job group 701 were Asian men. Again, the number of Asian professors theoretically available was eight.

30. The 1994–1995 difference was statistically significant using the two standard deviation test or using the 80% rule. The 1995–1996 difference yielded a standard deviation of 1.83, but met the 80% test.

31. UVM has not admitted that it has ever engaged in employment discrimination against racial or ethnic minorities, nor has there been a determination or decision that UVM has discriminated against any racial or ethnic minorities.

32. Nothing in UVM's AAPs requires it to engage in any preferences in hiring, nor is the AAP intended to create discriminatory preferences. On the contrary, the AAP Policy Statement for 1994–1995 states:

> [UVM] is committed to a policy of equal employment opportunity and to a program of affirmative action in order to fulfill that policy. [UVM] will accordingly recruit and hire into all positions the most qualified persons in light of job-related requirements and without regard to unlawful criteria including race, color, religion, national origin, sex, sexual orientation, disability, age, or status as a disabled or Vietnam–Era veteran.

33. Similarly, the AAP Policy Statement for 1995–1996 states:

> [UVM] is committed to a policy of equal employment opportunity and to a pro-

gram of affirmative action in order to fulfill that policy. [UVM] will recruit and hire into all positions qualified persons in light of job-related requirements, and will not unlawfully discriminate against applicants and employees in employment matters on the basis of race, color, religion, national origin, sex, sexual orientation, disability, age, or status as a disabled or Vietnam–Era Veteran, or other unlawful criteria, as these terms are defined under applicable law.

34. In 1985 UVM instituted a Minority Faculty Incentive Fund ("MFIF"), which made financial incentives available to departments to promote minority hiring for tenure track faculty positions. A 1989 document stated that MFIF funds could be used to "1) provide incentives to ensure successful recruiting of the minority faculty person; 2) support activities directly associated with the promotion of cross-cultural functions; or 3) augment department operating budgets including the support of research and equipment purchases."

35. The MFIF was a component of UVM's AAPs in 1994–1995 and 1995–1996 as part of its overall efforts to increase employment of minorities and women. Only if a faculty job group showed underutilization pursuant to the AAP for the particular AAP year would the position be eligible for incentive funds.

36. In 1995 a department which became eligible for supplementary funds from the MFIF by hiring a minority candidate could receive an amount equal to one half of the faculty position salary for five years. The funds could be used as the department saw fit.

37. Currently, the MFIF, renamed the Faculty Incentive Fund ("FIF"), awards incentive grants for the hiring of minority faculty and for the hiring of faculty who will enhance multi-cultural curricula, and gives financial assistance to increase the diversity of faculty candidate pools. No single award can exceed $10,000 in a given year. Hiring officials cannot know wheth-

er FIF funds will be awarded at the time they make their decision to hire, because applications for FIF funds are not considered until the beginning of the fiscal year following the hire, and are contingent upon availability.

38. The availability of funds under the MFIF or the FIF was not intended to influence hiring decisions, which were to be made on the basis of qualification for the position.

39. In 1994 UVM's affirmative action/equal opportunity information officer informed the faculty search committee that the CDAE chair position fell into a job group that was underutilized for women and minorities. She encouraged the search committee to conduct a broad search for qualified candidates, and suggested several techniques to ensure that their search was appropriately broad in scope.

40. Dr. Forcier and associate deans Donnelly and Foss ranked Dr. Halbrendt as their first choice for the CDAE chair before they knew whether MFIF funds would be available.

41. Dr. Forcier knew, prior to offering the CDAE position to Dr. Halbrendt, that if she accepted the position the department would become eligible for MFIF funding. However, the first award was not made until March 1996. The record does not reflect exactly when the decision was made to award MFIF funds to the department, nor when the dean was notified of the award.

42. CALS endeavors to ensure that a new faculty member "gets off to a good start" by ascertaining that it has base funding available to cover her salary package. In the case of tenured faculty, a department may be committing substantial financial resources to this person for decades. In this case, CALS had sufficient base funding to cover the chair's salary package without the MFIF awards.

43. As a result of Dr. Halbrendt's joining the faculty, the department will have received approximately $236,000.00 in MFIF funds by the year 2000.

44. The parties dispute whether and/or in what way race or the availability of MFIF funds played a part in the decision to hire Dr. Halbrendt. This critical issue of fact remains to be resolved by the fact finder in this case.

## II. *CONCLUSIONS OF LAW*

### A. *Instatement*

Dr. Honadle seeks equitable relief as well as monetary damages on her claims. Second Am.Compl. at 5 (paper 83). Specifically, she has requested that the Court order UVM to hire her "as a tenured faculty member with the rank of full professor and as Chair of the [CDAE department]." *Id.* UVM has asked this Court to rule in advance of trial that Dr. Honadle would not be entitled to instatement as chair should she prevail at trial.

■■■ A district court has "broad discretion to award 'appropriate' equitable relief to remedy unlawful discrimination." *Local 28 of Sheet Metal Workers' Int'l Ass'n v. Equal Employment Opportunity Comm'n,* 478 U.S. 421, 446, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (emphasis in original). Reinstatement has been found an appropriate means to make a plaintiff whole and to place her in the same position she would have been in absent the unlawful discrimination. *See e.g., McIntosh v. Irving Trust Co.,* 873 F.Supp. 872, 878 (S.D.N.Y.1995).[1] Reinstatement is not appropriate when an innocent person would be displaced from her job. *Briseno v. Cent. Technical Community College Area,* 739 F.2d 344, 348 (8th Cir.1984); *Spagnuolo v. Whirlpool Corp.,* 717 F.2d 114, 119–

121 (4th Cir.1983). Nor is it appropriate where a court would be substituting its judgment for that of the university with respect to a faculty member's qualifications for tenure, *Kunda v. Muhlenberg College,* 621 F.2d 532, 548 (3d Cir.1980); or where the result of reinstatement would be undue friction and controversy. *McKnight v. General Motors Corp.,* 908 F.2d 104, 115 (7th Cir.1990); *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728 (2d Cir.1984).

■■ The question here is whether, if a jury finds that UVM unlawfully discriminated against Dr. Honadle, ordering her instatement as the tenured chair of CDAE would be appropriate. The Court concludes that it would not, for four reasons, any one of which would render instatement inappropriate. First, instatement would injure Dr. Halbrendt, who is innocent of any wrongdoing. Second, granting Dr. Honadle's demand for instatement would inappropriately involve the Court in UVM's tenure decisions. Third, it is evident that relations between Dr. Honadle and members of the faculty and administration at CALS have significantly deteriorated since her initial excellent reception on campus. Fourth, the chair of CDAE is a high-level, complex, virtually unique position. It is likely, even if Dr. Honadle could overcome antagonism in the department and the administration, that this department, still in its relative infancy, would suffer a severe setback through an abrupt change in administration.

Accordingly, the Court rules that, should judgment be entered on behalf of Dr. Honadle on her discrimination claims, instatement will not be ordered.

### B. *Affirmative Action*

As the incomparable Judge John Minor Wisdom wrote more than thirty years ago,

---

1. Of course, Dr. Honadle's request is for instatement, not reinstatement; her status never progressed beyond candidate-finalist for the position. She claims, however, that but for the unlawful discrimination she would have been offered the position, and Dean Forcier confirmed that she would have been of-

fered the position had Dr. Halbrendt not accepted his offer. For the purpose of this analysis the Court need not distinguish between instatement and reinstatement, because the equities here do not justify reinstatement, much less instatement.

"[t]he Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination." *United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836, 876 (5th Cir.1966). Under some circumstances, to be color blind actually means to favor the group that has had and continues to have superior access to the opportunities for advancement in our society. Thus affirmative action programs may be race, ethnicity, gender and disability conscious, with the intention of advancing equality of opportunity.

Public employers such as UVM must comply with Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Both Title VII and the Equal Protection Clause prohibit employers from making employment decisions based on race. The Equal Protection Clause provides that no state may "deny to any person within its jurisdiction the equal protection of the laws." Title VII makes it unlawful for an employer to fail or refuse to hire an individual because of that individual's "race, color ... or national origin." 42 U.S.C. § 2000e–2(a). Different standards apply to review of an affirmative action program under Title VII than apply under the Equal Protection Clause. *See Johnson v. Transportation Agency*, 480 U.S. 616, 628 nn. 2, 6, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (Title VII prohibition not intended to extend as far as that of Constitution); *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 517. n. 8, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (acknowledging possibility that outcome of challenge to legality of race-conscious program could be different under Fourteenth Amendment than under Title VII); *United Steelworkers v. Weber*, 443 U.S. 193, 206 n.

6, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (Title VII not intended to incorporate and particularize commands of Fifth and Fourteenth Amendments).

### 1. *Title VII*

■ Title VII's prohibition against racial discrimination does not bar all race-conscious affirmative action efforts. *United Steelworkers*, 443 U.S. at 208, 99 S.Ct. 2721. In *United Steelworkers*, the United States Supreme Court held that despite Title VII's prohibition of employment discrimination "against any individual ... because of such individual's race," 42 U.S.C. § 2000e–2(a)(1), an employer could lawfully make race-conscious employment decisions "to eliminate manifest racial imbalances in traditionally segregated job categories," 443 U.S. at 197, 99 S.Ct. 2721, as long as "the plan does not unnecessarily trammel the interests of the white employees." *Id.* at 208, 99 S.Ct. 2721.

As the Court explained further in *Johnson*, 480 U.S. at 631, 107 S.Ct. 1442, a manifest imbalance that reflects underrepresentation of women or minorities in traditionally segregated job categories would justify a sex or race-conscious plan. A plan that uses race, ethnic background or sex merely as a "plus factor" in the consideration of otherwise qualified applicants for a position would not unnecessarily trammel the interests of nonminority applicants. *Id.* at 638, 107 S.Ct. 1442. The key points of the plan approved in *Johnson* were that it was remedial, temporary, did not employ set asides or quotas, did not unsettle firmly rooted expectations, was intended to attain rather than maintain a balanced work force, and used race or sex as only one factor among many in making the employment decision. *Id.* at 638–39, 107 S.Ct. 1442.

■ UVM's AAPs for 1994–1995 and 1995–1996 were developed in accordance with OFCCP regulations and with the purpose of increasing the employment and retention of women and minorities in fields

where they were under-represented. There is no evidence that the AAPs or anyone administering the AAPs dictated any hiring decisions. The undisputed evidence is that the employment goals developed pursuant to OFCCP regulations are target figures only, with which UVM need only make a good faith effort to comply. With the possible exception of the MFIF component of the plans, there is no evidence before this Court that any employment decisions, race-conscious or otherwise, are or were made on the basis of the AAPs. Moreover, if Dr. Halbrendt's race was a plus factor in UVM's decision to hire her, it was justified under Title VII.

Under a Title VII analysis, a manifest imbalance must exist in the job category at issue. *Johnson,* 480 U.S. at 632, 107 S.Ct. 1442. In determining whether a manifest imbalance exists for a job requiring specialized skills, a comparison should be made between the percentage of minorities or women in the employer's work force with those in the labor market possessing the requisite qualifications. *Id.* That comparison need not produce a discrepancy extreme enough to support a prima facie case of employment discrimination, however. *Id.*

Dr. Honadle has not challenged UVM's use of national census data, or its estimations of minority professor availability. She has focused her attack on whether the discrepancy between the number of minority professors in the job group actually teaching at UVM and the estimated number available to teach is significant enough to constitute a manifest imbalance. Dr. Honadle argues that "two or three standard deviations" is a "scientific threshold" for statistical significance, which UVM's numbers fail to meet.

The United States Supreme Court has stated that a difference between an expected and an observed value greater than two or three standard deviations would support a prima facie case of discrimination. *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308–09 n. 14, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).[2] But an employer may, consistent with Title VII, adopt an affirmative action plan where the disparity is not so striking. *Johnson,* 480 U.S. at 633 n. 11, 107 S.Ct. 1442. This Court concludes that UVM's numbers, showing under-representation above or near the two standard deviation level, demonstrated a manifest imbalance in employment of minorities in general and Asian Americans in particular in the faculty job category at issue. Given this obvious imbalance, UVM would have been justified in using Dr. Halbrendt's race as a plus factor in making its decision to hire. *Id.* at 637–38, 107 S.Ct. 1442.

Where a manifest imbalance exists, affirmative action is permitted under Title VII as long as the action does not unnecessarily trammel the interests of non-minorities. *Id.* at 630, 107 S.Ct. 1442. UVM's AAP, which in 1994–1996 included the MFIF, was remedial, temporary in that its goals were revised annually, and did not use set asides or quotas. If MFIF funds had an effect on the composition of the faculty, it served to attain rather than maintain a balanced workforce; the awards were limited in duration and incentive funds would no longer be available to a job group which did not show under-representation. Furthermore, Dr. Honadle may have been deeply disappointed in failing to receive the appointment she sought, but as a mere candidate-finalist for the position, her expectation of chairing the CDAE department could not conceivably have become firmly rooted. By contrast, the affirmative action plan condemned in *Taxman v. Board of Educ.,* 91 F.3d 1547 (3d Cir. 1996), *cert. dismissed,* —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997), lacked

**2.** The Supreme Court has also admonished: "statistics ... come in infinite variety.... [T]heir usefulness depends on all of the surrounding facts and circumstances." *Interna-* *tional Bhd. of Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

goals and standards, was unlimited in duration, was designed to maintain rather than attain a balanced workforce, and involved layoffs rather than hiring goals. *Id.* at 1564.

Because a manifest imbalance existed in the job group at issue, and UVM's affirmative action activities in response did not unnecessarily trammel the rights of non-minorities, UVM's AAP with its MFIF/FIF passes Title VII review.

### 2. *Equal Protection*

■ Under the Equal Protection Clause, racial classifications imposed by federal or state governmental actors are subject to strict scrutiny. *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). In order to survive strict scrutiny, such a classification must be narrowly tailored to further a compelling governmental interest. *Id.* at 235, 115 S.Ct. 2097. The only compelling governmental interest which a majority of the Supreme Court justices have recognized to date is that of remedying past discrimination by the governmental actor involved. *See Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 500, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). *See also Contractors Ass'n of Eastern Pa., Inc. v. City of Philadelphia,* 91 F.3d 586, 596 (3d Cir.1996); *Hopwood v. State of Texas,* 78 F.3d 932, 944 (5th Cir.1996).

The parties dispute whether the MFIF component of the AAPs had an influence on the decision to hire Dr. Halbrendt, and the resolution of that issue must be left to the fact finder. *See Messer v. Meno,* 130 F.3d 130, 136–37 (5th Cir.1997) (dispute of fact over scope and impact of AAP on promotion decision precluded summary judgment), *cert. denied,* —— U.S. ——, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999). But if the MFIF created a racial classification,

and availability of MFIF funds influenced the decision to hire Dr. Halbrendt, then it becomes Dr. Honadle's burden to show that this component of UVM's affirmative action program is invalid.

■ A threshold question thus is whether the MFIF or its successor, the FIF, created a racial classification at all. The MFIF was described in 1989 as a program "to provide special incentives to promote the filling of existing tenure-track faculty positions with U.S. minority persons." The funds available from the MFIF could be used to "1) provide incentives to ensure successful recruiting of the minority faculty person; 2) support activities directly associated with the promotion of cross-cultural functions; or 3) augment department operating budgets including the support of research and equipment purchases." The MFIF program did not require the granting of preferences to faculty candidates on the basis of race, but operated as an inducement.

As a racially conscious inducement, the MFIF bears some similarity to the program scrutinized by the Supreme Court in *Adarand.* *Adarand* was a challenge to the federal government's practice of giving general contractors a financial incentive to hire subcontractors certified as controlled by "socially and economically disadvantaged individuals," and its use of race-based presumptions in identifying such individuals. 515 U.S. at 204, 115 S.Ct. 2097. The case was remanded for strict scrutiny review of the regulatory scheme. *Id.* at 239, 115 S.Ct. 2097.[3]

*Adarand* did not precisely define the term "racial classification" for equal protection purposes, but the plurality opinion described such classifications as burdening or benefiting individuals on the basis of race, *id.* at 222, 115 S.Ct. 2097, or subjecting individuals to unequal treatment. *Id.*

---

**3.** On remand, the district court concluded that the scheme served a compelling governmental purpose, but was not narrowly tailored to further that purpose. *Adarand Constructors, Inc. v. Pena,* 965 F.Supp. 1556, 1570 (D.Colo.1997), *judgment vacated as moot,* 169 F.3d 1292 (1999).

at 224, 115 S.Ct. 2097. According to this description, a racial classification that does not confer a benefit or impose a burden on an individual would not implicate the equal protection clause. This description supports a distinction between "inclusive" forms of affirmative action, such as recruitment and other forms of outreach, and "exclusive" forms of affirmative action, such as quotas, set asides and layoffs. Inclusive as opposed to exclusive forms of affirmative action serve to broaden a pool of qualified applicants and to encourage equal opportunity, not to subject persons to unequal treatment in employment. *See Shuford v. Alabama State Bd. of Educ.,* 897 F.Supp. 1535, 1551–52 (M.D.Ala.1995).

A public university may therefore be racially "aware" or "conscious" by, for instance, amassing statistics on the racial and ethnic makeup of its faculty and encouraging broader recruiting of racial and ethnic minorities, without triggering the equal protection clause's strict scrutiny review. These activities do not impose burdens or benefits, nor do they subject individuals to unequal treatment. *See, e.g., Allen v. Alabama State Bd. of Educ.,* 164 F.3d 1347, 1352 (11th Cir.1999) (racially conscious outreach efforts to broaden applicant pool not subject to strict scrutiny); *Lutheran Church–Missouri Synod v. Federal Communications Comm'n,* 154 F.3d 487, 492 (D.C.Cir.1998) (not all race-conscious measures must be subjected to strict scrutiny) ("*Lutheran II*"); *Duffy v. Wolle,* 123 F.3d 1026, 1038–39 (8th Cir. 1997) (employer's affirmative efforts to recruit minority and female applicants not discrimination), *cert. denied,* —— U.S. ——, 118 S.Ct. 1839, 140 L.Ed.2d 1090 (1998); *Sussman v. Tanoue,* 39 F.Supp.2d 13, 23-25 (D.D.C.1999) (FDIC affirmative action plan does not allocate benefits on basis of race or gender; does not trigger strict scrutiny); *Shuford, id.* (techniques of inclusion such as recruitment not subject to Title VII and equal protection analysis

used for techniques of exclusion such as hiring quotas, set asides, layoffs). If that university, however, then engages in race-preferential decision-making such as hiring, firing or promotion, that action will be subject to strict scrutiny.

*Adarand* involved an inducement to hire; it did not discuss race-conscious yet nonpreferential activities such as recruiting or other forms of outreach. *But see Lutheran Church–Missouri Synod v. Federal Communications Comm'n,* 141 F.3d 344, 351 (D.C.Cir.1998) (opining that statistical analysis and recruiting efforts affect employment decisions) ("*Lutheran I*"). The parties in this case have disputed whether the MFIF/FIF's racially conscious inducement was an inducement to hire, triggering strict scrutiny, or merely an inducement to enhance equal opportunity through expanded recruitment.

Essentially the parties dispute both the purpose and the effect of the MFIF/FIF. The evidence of record persuades this Court that Dr. Honadle has not demonstrated by a preponderance that UVM's AAP and its MFIF/FIF have the purpose of creating an inducement to hire. The current FIF description explicitly states that the availability of incentive funds shall not be a determining factor in hiring decisions. The testimony reflects that the MFIF/FIF was never intended to be an inducement to hire. The award of incentive funds is not automatic upon the hiring of a minority faculty member, but depends upon availability of funds. A decision to award funds may not be made until long after the hiring decision. The total of incentive funds potentially available represents a relatively small proportion of the total financial obligation associated with the hiring of a tenured or tenure-track professor, especially in the current version of the FIF, which limits total awards to $50,000.[4]

---

4. This is not to suggest that there is a *de minimis* exception to the Equal Protection

Clause. *See Lutheran I,* 141 F.3d at 351. The facts cited serve to persuade the Court that

UVM's AAP and its MFIF/FIF do not create a racial classification demanding strict scrutiny; accordingly, Dr. Honadle's request for a permanent injunction against providing incentive grants is denied.

 If, however, apart from the issue of the *purpose* of the MFIF/FIF, it is found at trial that awareness of the availability of MFIF funds had the *effect* of influencing the decision to hire Dr. Halbrendt, the MFIF does not withstand strict scrutiny review. UVM has not demonstrated through statistics or otherwise that its asserted compelling purpose of remedying past or present discrimination is valid. Although an affirmative action plan may be justified under Title VII by statistical evidence of a "manifest imbalance" in the workforce, *Johnson,* 480 U.S. at 630, 107 S.Ct. 1442, evidence of "gross statistical disparities" is required to withstand an equal protection challenge. *Croson,* 488 U.S. at 501, 109 S.Ct. 706 (quoting *Hazelwood,* 433 U.S. at 307–08, 97 S.Ct. 2736).

UVM has shown a manifest imbalance in the job group at issue, but its roughly two standard deviation difference between expected and observed values does not demonstrate gross statistical disparity. UVM has introduced no evidence apart from its statistical analysis that there has been prior discrimination at UVM.[5] It has articulated no other purpose asserted to be compelling, such as encouraging diversity or ensuring equal opportunity. *See Wygant,* 476 U.S. at 286, 106 S.Ct. 1842 (O'Connor, J., concurring) (racial diversity a compelling interest in context of higher education; Court is not foreclosed from finding other interests relied upon by lower courts compelling); *Metro Broadcasting, Inc. v. Federal Communications Comm'n,* 497 U.S. 547, 566, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (broadcast diversity is important

the MFIF/FIF was intended to enhance equal opportunity through recruitment efforts, not to induce racial preference in hiring decisions.

**5.** UVM need not admit or demonstrate past discrimination to support an affirmative ac-

governmental objective justifying racial classification), *overruled by Adarand,* 515 U.S. at 227, 115 S.Ct. 2097 (racial classification must further compelling governmental interest); *Regents of the Univ. of Calif. v. Bakke,* 438 U.S. 265, 311–12, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J.) (attainment of diverse student body is constitutionally permissible goal); *University and Community College Sys. v. Farmer,* 113 Nev. 90, 930 P.2d 730, 735 (1997) (University has compelling interest in fostering culturally and ethnically diverse faculty), *cert. denied,* —— U.S. ——, 118 S.Ct. 1186, 140 L.Ed.2d 317 (1998). Thus, if the jury determines that MFIF funds influenced UVM's decision to hire Dr. Halbrendt, UVM cannot justify its actions under the Equal Protection Clause.

### III. *CONCLUSION*

Based upon the above findings and conclusions, the Court rules as follows:

1. The remedy of instatement is not appropriate should Dr. Honadle prevail on her claims;

2. UVM's affirmative action plan, including the incentive fund, does not violate Title VII.

3. UVM's affirmative action plan, including the incentive fund, does not on its face create racial classifications within the meaning of the equal protection clause.

4. If Dr. Honadle demonstrates that race influenced the decision to hire Dr. Halbrendt through the operation of the MFIF or otherwise, UVM may not argue in defense of its action that its affirmative action plan (which at the time included the MFIF) was valid under the equal protection clause.

tion plan against an equal protection challenge, but it must have sufficient evidence to justify the conclusion that there has been prior discrimination. *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842.

5. Dr. Honadle's request that UVM be "permanently enjoined from providing incentive grants or otherwise expending funds conditioned upon hiring minority persons and from considering race or ethnicity in faculty hiring decisions" is denied.