**Ronald F. BERKLEY, et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**No. 98–943C.**

United States Court of Federal Claims.

Dec. 19, 2000.

Barry P. Steinberg, Kutak Rock, Washington, D.C., attorney of record for the plaintiffs. William A. Aileo, Springville, Pennsylvania, of counsel.

Lee J. Freedman, Commercial Litigation Branch, James M. Kinsella, Deputy Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, David W. Ogden, Assistant Attorney General, United States Department of Justice, Washington, DC, attorneys of record for the defendant. Jeh C. Johnson, General Counsel, Department of the Air Force, Major Jennifer Grimm, Office of the Judge Advocate General, of counsel.

## OPINION

HORN, Judge.

This case arises out of an Air Force Secretary's Memorandum of Instruction given to an Air Force Reduction–In–Force (RIF) Board. Plaintiffs claim that the Memorandum violated their rights under the Fifth Amendment to the United States Constitution by allegedly requiring the Board to consider race and gender as factors in making its decision. The Memorandum, however, does not include a racial or gender classification bestowing a benefit or burden based on that classification which would require the imposition of heightened scrutiny by the court of the government action. In order to ensure a fair and equitable process for all officers and to select the best officers for retention, the Memorandum reminds Board Members of the possibility that historical discrimination may have caused the records of minority and female officers to inaccurately reflect their actual abilities from a total career perspective. The Memorandum does

not require Board Members to artificially raise or lower an officer's score based on race or gender. Moreover, the Secretary's Memorandum of Instruction is rationally related to the legitimate government interest of establishing the proper, total composition of Air Force personnel. Plaintiffs were not denied equal protection under the law.

## FINDINGS OF FACT

Plaintiffs are a certified, opt-in class consisting of 623 former commissioned officers of the United States Air Force.[1] The plaintiffs were considered and selected for involuntary separation from the United States Air Force by the Fiscal Year 1993 Reduction–In–Force Board (FY93 RIF Board). The plaintiffs allege that the FY93 RIF Board violated their Fifth Amendment rights to equal protection under the law pursuant to the United States Constitution. Specifically, plaintiffs claim that, based on a Memorandum of Instruction issued by the Secretary of the Air Force, the FY93 RIF Board improperly took race and gender into account when it considered which officers it would select for involuntary separation.

In July 1992, due to congressionally mandated reductions in the manpower levels of the armed forces, the Secretary of the Air Force established the FY93 RIF Board to select officers in the Air Force for involuntary separation in Fiscal Year 1993, and issued a Memorandum of Instruction to provide guidance to the Board. The relevant portions of the Secretary's Memorandum of Instruction state:

This Board is being convened under the provisions of Title 10, United States Code, and Air Force Regulation 36–12. The purpose of the FY93 Reduction–In–Force (RIF) Board is to select reserve captains and lieutenants of the line in the 1980 through 1989 year groups for involuntary separation.

The number of eligibles and the quota for each year group will be outlined in a subsequent briefing. The quota is highest for the earlier year groups and gets progressively lower for more recent year groups. Officers in earlier year groups were considered for regular augmentation one or more times. Most were offered monetary incentives to separate voluntarily and will receive separation pay if selected by this Board. Officers in the 1986 and later year groups have not competed for augmentation, most were not eligible for VSI/SSB, and few will receive separation pay. The quota for each year group considers these factors.[2]

You must act in the best interest of the Air Force and not any particular command, speciality or group. While you're here you work directly for me under the supervision of General Dekok whom I have appointed as president of the Board. He's a nonvoting member and will perform administrative duties to ensure the Board is conducted in accordance with Title 10, Air Force regulations, and my guidance. He has no authority to determine any matter that would constrain the Board from recommending for continued service those officers best qualified to meet the needs of the Air Force.

Use the whole person concept to assess such factors as job performance, professional qualities, leadership, depth and breadth of experience, job responsibility, academic and professional military education [PME], and specific achievements.

You'll be scoring records of highly specialized officers who, because of mission requirements, may have a narrow range of duties when compared to others who have a broader range of experience. The Air Force needs both highly specialized and more generalized officers.

Assess academic and professional military education in terms of how they enhance performance and potential. Do not give disproportionate weight to the mere

---

1. On November 5, 1999, this court certified a class in the above captioned case. *Berkley v. United States*, 45 Fed.Cl. 224 (1999).

2. The year group quotas described in this paragraph are the only quotas referenced in the Secretary's Memorandum of Instruction. The quotas referred to reflect the number of officers to be separated in a given year group. This paragraph does not discuss how individual officers were to be selected for separation.

fact that an officer has completed advanced education. Do not consider completion of PME as a pass-fail requirement. The overriding factor must be job performance.

Your evaluation of minority and women officers must clearly afford them fair and equitable consideration. Equal opportunity for all officers is an essential element of our selection system. In your evaluation of the records of minority and women officers, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization of policies or practices, may have placed these officers at a disadvantage from a total career perspective. The Board shall prepare for review by the Secretary and the Chief of Staff, a report of minority and female officer selections as compared to the selection rates for all officers considered by the Board. You're prohibited from considering an officer's marital status or the employment, educational, or volunteer service activities of an officer's spouse. If you see such information in the records you review, you will disregard it.

Each of you (the president, members, recorders, and administrative support personnel) is responsible to maintain the integrity and independence of this selection Board, and to foster the fair and equitable consideration, without prejudice or partiality, of all eligible officers.

\*     \*     \*     \*     \*     \*

Of the selected paragraphs taken from the Secretary's Memorandum quoted immediately above, the seventh paragraph, beginning "Your evaluation," is cited by plaintiffs in their complaint as the primary source of the Board's allegedly prejudicial actions. Plaintiffs assert that the Secretary's Memorandum of Instruction directed the FY93 RIF Board to improperly consider the racial and gender characteristics of each commissioned officer when selecting candidates for separation. Plaintiffs further allege that, as a result of the Secretary's Memorandum, they were unjustly chosen for early separation and demand enforcement of their rights guaranteed by the Fifth Amendment to the United States Constitution.

The Secretary's Memorandum also instructed that, following the selection process, the FY93 RIF Board was to prepare a report for the Secretary comparing the final selection rates for female and minority officers to the final selection rates of all officers considered by the Board. The plaintiffs allege that this reporting requirement further demonstrates the use of racial and gender classifications by the FY93 RIF Board as allegedly directed in the Secretary's Memorandum of Instruction.

Although defendant concedes jurisdiction, it argues that the court owes broad deference to military decision making when reviewing the personnel actions of the FY93 RIF Board. The defendant maintains that no requirement of the Secretary's Memorandum directs the use of any racial or gender classifications. Moreover, defendant characterizes the reporting requirement as one to report facts following completion of the selection process. The defendant argues that the Secretary's Memorandum of Instruction is facially neutral, does not direct the use of racial or gender classifications, and, thus, does not require heightened scrutiny by this court.

In the complaint as filed, plaintiffs request the court to find the actions of the FY93 RIF Board in violation of the Constitution, and the selection of those chosen for involuntary separation by the Board, as well as the resultant involuntary separations, invalid. Plaintiffs also request that all class members receive active duty pay in the grade they were serving at the time of their involuntary separation through the date of judgment by the court, and that they be returned to active duty with all rights and privileges as if their service had not been interrupted. In addition, plaintiffs ask the court to order the Secretary of the Air Force to correct all plaintiffs' military records. Plaintiffs further request attorneys' fees and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (1994 & Supp. IV 1998).

## DISCUSSION

■  The parties have not contested jurisdiction in this case, and have cross-moved for

judgment on the administrative record. The government, however, argues that the court must take into account and defer to the special expertise and needs of the military regarding the day-to-day management decisions made by the Air Force when making its decision. *See Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842, *reh'g denied,* 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953). The court agrees that the military should be accorded broad deference in the handling of its internal affairs. However, "[r]eview of compliance with statute, regulation, and the Constitution is the judicial responsibility." *Holley v. United States,* 124 F.3d 1462, 1468 (Fed.Cir.), *reh'g denied* (1997); *see also Chappell v. Wallace,* 462 U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (noting that military personnel retain basic constitutional rights); *Woodward v. United States,* 871 F.2d 1068, 1072 (Fed.Cir. 1989), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990). " '[M]en and women in the Armed forces do not leave constitutional safeguards and judicial protection behind when they enter military service.' " *Holley v. United States,* 124 F.3d at 1466 (quoting *Weiss v. United States,* 510 U.S. 163, 194, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994) (Ginsburg, J., concurring)). Simply labeling a decision "military" does not dictate an automatic result. *See Rostker v. Goldberg,* 453 U.S. 57, 70, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). Therefore, although the personnel decisions of the armed forces may be reviewable, the Supreme Court has demonstrated sensitivity to the deference to be accorded to the special expertise, circumstances and needs of the armed forces when evaluating allegations that the military violated the Constitution. *See Woodward v. United States,* 871 F.2d at 1076 (quoting *Beller v. Middendorf,* 632 F.2d 788, 810 (9th Cir.1980), *cert. denied sub nom., Beller v. Lehman,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981)); *see also Weiss v. United States,* 510 U.S. at 176–77, 114 S.Ct. 752 (rejecting a procedural due process claim); *Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (denying a First Amendment claim); *Rostker v. Goldberg,* 453 U.S. at 65–72, 101 S.Ct. 2646 (rejecting an equal protection claim).

The parties have filed cross-motions seeking judgment on the administrative record. Rule 56.1 of the Rules of the United States Court of Federal Claims (RCFC) treats such motions as motions for summary judgment under RCFC 56(a). *Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255, 1997 WL 177509 (Fed.Cir.1997) (table). Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party must demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991). A fact is material if it will make a difference in the result of a case. *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Summary judgment "saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. 'Useless' in this context means that more evidence than is already available in connec-

tion with the motion for summary judgment could not reasonably be expected to change the result." *Dehne v. United States*, 23 Cl. Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.*, 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *Lane Bryant, Inc. v. United States*, 35 F.3d 1570 (Fed.Cir. 1994). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622, 1991 WL 93077 (Fed.Cir.1991) (table). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.* at 587–88, 106 S.Ct. 1348; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied* (1998); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir. 1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied* (1995); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings by use of evidence such as affida-

vits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States*, 29 Fed. Cl. 318, 322 (1993), *aff'd*, 31 F.3d 1176, 1994 WL 329612 (Fed.Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d at 1391. After reviewing the parties' submissions, the court agrees that there are no material factual disputes. Therefore, disposal of the case before the court on cross-motions for judgment on the administrative record is appropriate.

■ Equal protection analysis involves several steps. The first inquiry must be whether the government action, on its face, explicitly classifies citizens on the basis of a suspect class. *See Hunt v. Cromartie*, 526 U.S. 541, 546, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). A facially neutral government action requires heightened scrutiny only if it can be proven that it was motivated by a discriminatory purpose or object, or is unexplainable on grounds other than a suspect class. *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 913, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) and *Shaw v. Reno*, 509 U.S. 630, 644, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977))); *see also McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir.1999) (requiring appellants to first show that the statute, either on its face or in the manner of its enforcement, resulted in members of a certain group being treated differently from other persons based on membership in that group), *cert. denied*, 528 U.S. 1086, 120 S.Ct. 814, 145 L.Ed.2d 685 (2000); *E & T Realty v. Strickland*, 830 F.2d 1107, 1112 n. 5 (11th Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). When, on the face of the statute, or in the manner of its enforcement, a plaintiff proves that a suspect class was treated differently, the court must proceed to analyze whether the government's distinction between the groups is justified under a heightened level of scrutiny. *See McLean v. Crabtree*, 173 F.3d at 1185; *see also Plyler v. Doe*, 457 U.S. 202, 217–18, 102 S.Ct. 2382, 72 L.Ed.2d 786, *reh'g denied*, 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982).

■ When a plaintiff challenges a government action which has been identified as racially discriminatory, the government action must survive a strict level of scrutiny and the government must prove that the classification is narrowly tailored to a compelling state interest. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); *H.B. Mac Inc. v. United States*, 153 F.3d 1338, 1345 n. 7 (Fed.Cir.1998). When a plaintiff challenges a government action which has been identified as discriminatory based on gender the government action must survive a somewhat less strict, but nonetheless heightened, level of scrutiny. *See United States v. Virginia*, 518 U.S. 515, 532–33, 116 S.Ct. 2264, 135 L.Ed.2d 735; *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090. The government must prove that the classification

serves an important governmental objective and that the discriminatory means are substantially related to achieving that objective. *See United States v. Virginia*, 518 U.S. at 533, 116 S.Ct. 2264; *Mississippi Univ. for Women v. Hogan*, 458 U.S. at 724, 102 S.Ct. 3331. If the government action does not classify persons based on a suspect class, the government action is presumed to be valid and an equal protection challenge to that action must be rationally related to a legitimate state interest. *See Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 442, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Woodward v. United States*, 871 F.2d at 1076. As discussed in *Heller*, an equal protection challenge against a neutral classification, one not based on a suspect class, will fail if there is any reasonable set of facts that can provide a rational basis for the use of that classification. *Heller v. Doe*, 509 U.S. at 320, 113 S.Ct. 2637. The burden is on the challenger to " 'negative every conceivable basis which might support it.' " *Id.* (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351, *reh'g denied*, 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 200 (1973)); *see also McLean v. Crabtree*, 173 F.3d at 1186 ("Because 'prisoners with detainers' does not constitute a suspect class, the detainer exclusion is valid so long as it survives the rational basis test which accords a strong presumption of validity.").

At the November 8, 2000 oral argument in this case, plaintiffs stated that their complaint rests solely on a claim that the Secretary's Memorandum of Instruction was discriminatory on its face. Moreover, the plaintiffs have not argued that the Secretary's Memorandum was motivated by a racial or gender based purpose or object, or was unexplainable on grounds other than race or gender. Therefore, the question before the court revolves on a review of the words of the Secretary's Memorandum of Instruction. If the Secretary's Memorandum, on its face, directs the use of racial or gender classifications, the court must employ strict scrutiny to review any racial classifications, and marginally less, but nonetheless heightened scrutiny, to review any gender classifications, in order to determine if the actions of the FY93 RIF Board violated constitutionally based guarantees. Additionally, in the event that the government action has been found neutral, the government's action must be tested by determining whether the government had a rational basis for taking the action it did.

■ Courts have defined a facially suspect classification as, for example, a "governmental standard, preferentially favorable to one race or another, for the distribution of benefits." *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir.), *cert. denied*, 525 U.S. 811, 119 S.Ct. 44, 142 L.Ed.2d 34 (1998) (deriving the rule from *Adarand Constructors, Inc. v. Pena*, 515 U.S. at 226–27, 115 S.Ct. 2097 and *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989)); *see also Hayden v. Nassau*, 180 F.3d 42, 48 (2d Cir.1999) ("A statute or policy utilizes a 'racial classification' when, on its face, it explicitly distinguishes between people on the basis of some protected category."); *Pitts v. Thornburgh*, 866 F.2d 1450, 1453–54 (D.C.Cir.1989) (finding a facial, gender classification when female offenders were imprisoned further away from their homes than male offenders and were thus "substantially burdened"). Courts have not read *Adarand* so broadly as to require heightened scrutiny of any government action or statute which mentions a suspect class. *See Allen v. Alabama State Bd. of Educ.*, 164 F.3d 1347, 1352 n. 2 (11th Cir.1999), *vacated by joint mot. of the parties*, 216 F.3d 1263 (11th Cir.2000) (citing *Lutheran Church–Missouri Synod v. FCC*, 154 F.3d 487, 492 (D.C.Cir.) (focusing on whether regulations pressured government actors to make race-based hiring decisions), *suggestion for reh'g en banc denied*, 154 F.3d 494 (D.C.Cir.1998)); *Raso v. Lago*, 135 F.3d at 16; *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 711 (9th Cir.1997) ("*Adarand* applies only when the government subjects a 'person to unequal treatment.' "), *reh'g en banc denied*, 138 F.3d 1270 (9th Cir.1998). Thus, to violate the Constitution, a directive, such as the Secretary's Memorandum of Instruction, must include more than a mere mention of race or gender. The government

action must bestow a benefit or burden, based on a suspect classification, to taint the action with the stigma of invidious discriminatory intent. Only then is heightened scrutiny required.

Rulings issued by the federal courts evidence a recognition of the difference between the mere mention of race or gender and the improper use of a suspect classification. The courts have identified select affirmative action techniques, which, when found on the face of the action, require heightened scrutiny. *See, e.g., Adarand v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (requiring strict scrutiny of the government's practice of classifying economically disadvantaged individuals using race based presumptions); *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (disapproving percentage set-asides for minority businesses); *Regents of Univ. of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (invalidating an admissions quota system); *Hopwood v. Texas,* 78 F.3d 932 (5th Cir.), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996) (rejecting admittance procedures which purposefully admitted black and Hispanic students with lower entrance examination scores and grade point averages).

This court also notes that in his decision in *Bakke,* Justice Powell, while finding the admissions system at issue unconstitutional based on racial quotas, recognized that the records of candidates may contain inaccuracies due to past or current discrimination and that government action to review a candidate's record with this recognition in mind may not result in a preference or improper classification. *Regents of Univ. of California v. Bakke,* 438 U.S. at 306 n. 43, 98 S.Ct. 2733. In the context of admissions to medical schools, Justice Powell wrote, "[t]o the extent that race and ethnic background were considered only to the extent of curing established

inaccuracies in predicting academic performance, it might be argued that there is no 'preference' at all." *Id.* Such considerations may be employed without using a classification in order to achieve "fair appraisal of each individual's academic promise in light of some cultural bias in grading or testing procedures." *Id.*

A similar analysis was suggested in *Allen v. Alabama State Board of Education*[3] and *Hayden v. Nassau.* These cases involved entrance examinations for teachers and police departments, respectively. In *Allen,* the parties had entered into a consent decree which required any future examination to "be fashioned by using a system designed to avoid an unjustifiable discriminatory impact on African–American teacher candidates, and specifically forbade the use of any teacher certification examination that would have a discriminatory impact on African–Americans unless that exam had been validated for teacher certification." *Allen v. Alabama State Bd. of Educ.,* 164 F.3d at 1349. The Board had asserted that it could not follow the consent decree without violating the Equal Protection Clause of the Constitution. *Id.* at 1352. The Eleventh Circuit found that the decree only required the Board to "be conscious of race in developing the examination, [by] choosing test items to minimize any racially disparate impact within the framework of designing a valid and comprehensive teaching examination" and that "[n]othing in *Adarand* requires the application of strict scrutiny to this sort of race-consciousness." *Id.* at 1353.

Similar to *Allen, Hayden* involved a consent decree which required the Nassau County Police Department to create an examination which would minimize any adverse impact on minority applicants. *Hayden v. Nassau,* 180 F.3d at 46–47. Plaintiffs argued that the subsequent examination violated the

---

**3.** Although *Allen* was eventually vacated by joint motion of the parties in *Allen v. Alabama State Board of Education,* 216 F.3d 1263 (11th Cir. 2000) and is no longer binding precedent in the Eleventh Circuit, it still provides sound guiding analysis. *See Hadley v. United States,* 229 Ct.Cl. 591, 594–95, 1981 WL 22067 (1981) (stating that although the previous Court of Claims opinion was vacated, its reasoning still remained valid);

*In re Memorial Hosp.,* 862 F.2d 1299, 1302 (7th Cir.1988) (stating that a decision "does not vanish on vacatur, although such an order clouds and diminishes the significance of the holding"); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,* 160 B.R. 882, 898 (Bankr.S.D.N.Y.1993) ("A logical and well-reasoned decision, despite vacatur, is always persuasive authority.").

United States Constitution. *Id.* at 47. The Second Circuit found that "the only manner in which race was implicated is that Nassau County set out to design an entrance exam which would diminish the adverse impact on black applicants. This desire, in and of itself, however, does not constitute a 'racial classification.'" *Id.* at 48.

Apparent in Justice Powell's comments in *Bakke,* the Eleventh Circuit's opinion in *Allen* and the Second Circuit's opinion in *Hayden* is the concept that when the government evaluates candidates for a position, certain qualified individuals may be improperly eliminated because the procedures or the effect of historical discrimination falsely reflect an inadequacy in the candidate's qualifications. Thus, it is not improper for the government to promote equal treatment by securing a fair appraisal of a candidate's value so that the overall best qualified and suitable candidates may be selected. The government may act in this fashion without using racial or gender classifications. The Secretary's Memorandum of Instruction to the FY93 RIF Board in the instant case operated in such a manner. As discussed below, the Secretary's Memorandum aimed to provide equal treatment to all officers and to urge the FY93 RIF Board to select the best qualified officers for retention in the Air Force. The specific mention in the Secretary's Memorandum of Instruction of minority and female officers simply acted to remind Board Members, who might in fact have been sensitive based on their own past experiences, that due to possible past discrimination, the records of women and minority officers may not reflect their actual abilities from a total career perspective.

■ The Secretary's Memorandum of Instruction can be analogized to other executive branch directives put forth by the Secretaries of cabinet level agencies or of branches of the military, including regulations appearing in the Code of Federal Regulations. "In determining the meaning of such regulations, rules of interpretation applicable to statutes are appropriate tools of analysis." *Gen. Elec. Co. v. United States,* 221 Ct.Cl. 771, 778, 610 F.2d 730, 734 (1979); *accord Wronke v. Marsh,* 787 F.2d 1569, 1574 (Fed.Cir.)

(stating that for the interpretation of regulations, just as in the interpretation of statutes, courts must begin with their plain language), *cert. denied,* 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986); *see also Rice v. Martin Marietta Corp.,* 13 F.3d 1563, 1568 (Fed.Cir. 1993) (noting that the canon of statutory construction which states that "where the text permits, statutes dealing with similar subjects should be interpreted harmoniously" is "equally applicable" to regulations). Thus, the court believes that judicial rules of construction developed for the interpretation of statutory and regulatory language can be useful in the present case as a logical and appropriate method to analyze the words of the Secretary's Memorandum of Instruction. While a number of these rules of construction, in addition to discussing how to decipher statutory language, also discuss legislative history and congressional intent, neither of which are relevant in the instant case of a facial review of the Secretary's Memorandum, the principles are broad enough to be of measurable assistance in the present case. *See, e.g., Steffan v. Aspin,* 8 F.3d 57, 64–65 (D.C.Cir.1993) (examining the "plain meaning" of a Department of Defense directive), *aff'd sub nom., Steffan v. Perry,* 41 F.3d 677 (D.C.Cir.1994).

■ The United States Court of Appeals for the Federal Circuit has offered guidance on how to approach statutory interpretation as follows:

> Statutory construction requires the application of recognized rules. *See generally Sutherland Statutory Construction* (4th ed.). First, " " '[t]he starting point in every case involving construction of a statute is the language itself.' " " *Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978). Second, where a statute states what a term "means" then all other meanings not stated are excluded. *Colautti v. Franklin,* 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 684 n. 10, 58 L.Ed.2d 596 (1979).

*Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1559 (Fed.Cir.1988), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989).

■ Accepted principles of statutory construction also provide that courts must interpret a statute as a whole. *Massachusetts v. Morash,* 490 U.S. 107, 114–15, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989). To this effect, the Supreme Court has written:

> On numerous occasions we have noted that " " " "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." " " *Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), quoting *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 221, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (quoting *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 285, 76 S.Ct. 349, 100 L.Ed. 309 (1956) (in turn quoting *United States v. Heirs of Boisdore,* 8 How. 113, 122, 12 L.Ed. 1009 (1850))).

*Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *see also Sutherland Statutory Construction* 46.05, 46.06 (5th ed.1992). Courts must " 'give effect, if possible, to every clause and word of a statute.' " *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (quoting *Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883)). " 'The cardinal principle of statutory construction is to save and not to destroy.' " *United States v. Menasche,* 348 U.S. at 538, 75 S.Ct. 513 (quoting *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937)).

■ Furthermore, in construing a statute, courts should not attempt to interpret a provision such that it renders other provisions of the same statute inconsistent, meaningless or superfluous. *Boise Cascade Corp. v. U.S. EPA,* 942 F.2d 1427, 1432 (9th Cir.1991); *see also Sutherland Statutory Construction* 46.06 (5th ed.1992). The meaning of statutory language depends on context and a statute should be read as a whole. *See*

*Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (citing *Shell Oil Co. v. Iowa Dept. of Revenue,* 488 U.S. 19, 26, 109 S.Ct. 278, 102 L.Ed.2d 186 (1988)). " 'Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used.' " *King v. St. Vincent's Hosp.,* 502 U.S. at 221, 112 S.Ct. 570 (quoting *NLRB v. Federbush Co.,* 121 F.2d 954, 957 (2d Cir.1941) (L.Hand, J.)). Therefore, in the instant case, when reviewing the Secretary's Memorandum of Instruction, the court should construe each portion of the Memorandum in connection with each of the other portions, so as to produce a harmonious whole.

■ Taken as a complete document, the Secretary's Memorandum of Instruction does not impose either a racial or a gender classification bestowing benefits or burdens on a suspect class. This is evident when the plain language of those portions of the Memorandum which specifically mention female and minority officers is considered within the context of the whole text. The Secretary's Memorandum evidences two main goals which are repeatedly articulated throughout the Memorandum. The first goal is to create a process which will result in "equal opportunity for all officers" and, therefore, secure a fair and equal RIF process for all. The second goal is to ensure retention of the best qualified officers in order to meet the needs of the Air Force. The specific mention of female and minority officers in the Memorandum operates to increase sensitivity toward officers who, although perhaps equally qualified, may appear less so from a record of their career, perhaps because of possible lack of opportunity along their career paths.[4]

---

4. Although evidence of past discrimination is not necessary for the court to conclude that the Secretary's Memorandum on its face did not include a suspect classification requiring heightened scrutiny, past discrimination and lack of opportunity in the military with respect to minorities and women are historical facts. For example, the Supreme Court has recognized that "male

and female line officers in the Navy are not similarly situated with respect to opportunities for professional service." *Schlesinger v. Ballard,* 419 U.S. 498, 508, 95 S.Ct. 572, 42 L.Ed.2d 610, *reh'g denied,* 420 U.S. 966, 95 S.Ct. 1363, 43 L.Ed.2d 446 (1975). The Supreme Court specifically noted that restrictions on a woman's ability to participate in combat and most sea duty in the

The Secretary's Memorandum does not require or encourage a Board Member to aid any officers by artificially boosting their scores.

The Secretary's commitment to equality for all officers during the RIF process is evident throughout the language of the Memorandum of Instruction, reflecting a deliberate devotion to creating a process which is fair and impartial. The third paragraph of the Memorandum commands Members of the FY93 RIF Board that, "[y]ou must act in the best interest of the Air Force and not any particular command, specialty or group." Even the contested paragraph of the Secretary's Memorandum, alleged by the plaintiffs to be constitutionally offensive, begins by stating that the Board must afford minority and women officers "fair and equitable consideration." This paragraph continues by stating that "[e]qual opportunity for all officers is an essential element of our selection system." On page three of the Memorandum, the reviewers are directed to "maintain the integrity and independence of this selection Board, and to foster the fair and equitable consideration, without prejudice or partiality, of all eligible officers." The language quoted reflects the Secretary's overriding, repeatedly articulated concern that all officers are to be reviewed equally. The fact that this concept is restated throughout the text of the Memorandum in prominent positions in the paragraphs underscores the Secretary's approach.

The language of the Memorandum of Instruction also evidences a focus on selecting those officers who have the best ability to perform on the job and to contribute to the overall mission of the Air Force. As quoted above, the FY93 RIF Board is instructed to act in the best interest of the Air Force. This direction also is clear from the language which requires the Board to use a "whole person concept" to assess a number of factors. Board Members are repeatedly cautioned not to place undue weight on any one

factor. For example, the Memorandum reads that the "Air Force needs both highly specialized and more generalized officers." Nor, according to the Memorandum, should a Board Member give disproportionate weight to completion of advanced education, or consider an officer's marital status or the employment status of an officer's spouse. In addition, the Memorandum states that "[t]he overriding factor must be job performance" and directs the Board to find "those officers best qualified to meet the needs of the Air Force." Finally, Board Members are to review officers from a "total career perspective." The Secretary's emphasis on selecting officers who best fit the needs of the Air Force does not single out a particular group of officers for retention or for separation.

It is within this framework that the specific words regarding women and minorities must be considered. The Memorandum of Instruction directs Board Members that, "in your evaluation of the records of minority and women officers, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization of policies or practices, may have placed these officers at a disadvantage from a total career perspective." The plain language of the Memorandum does not direct Board Members to take any specific action toward female or minority officers, such as lowering or raising scores. It only reminds Board Members to be sensitive to the obstacles that may have been placed in the way of female and minority officers when reviewing their records from a total career perspective.

Pursuant to the rules on statutory construction outlined above, the language alleged by plaintiffs to be offensive must be harmonized with the twin goals of providing a fair and equitable RIF process and thereby ensuring retention of the best qualified officers to meet the needs of the Air Force. The only reading of the language at issue which comports with these requirements is

Navy have resulted in the situation that "female lieutenants will not generally have compiled records of seagoing service comparable to those of male lieutenants." *Id.* Certainly, similar restrictions have been applied in the Air Force. *See* GAO, GAO/NSIAD 96–17, *Military Equal Oppor-*

*tunity—Certain Trends in Racial and Gender Data May Warrant Further Analysis* (1996) (finding that in thirty-seven percent of promotion boards examined, one or more minority groups had statistically significant lower odds of being promoted than whites).

not to read into the text any unstated agenda, but to conclude, as the words of the directive clearly state, that when reviewing an officer's performance record, the Secretary's Memorandum reminds Board Members that the records of female and minority officers may not fully and accurately reflect the officer's qualifications and capabilities from a total career perspective, perhaps due to lack of past opportunity. This reading is consistent with the goal of an equitable selection process in that it ensures that women and minorities will not be placed at an unfair disadvantage when their records may inaccurately reflect their actual ability from a total career perspective. The interpretation also is consistent with the goal of selecting the best officers for retention in the Air Force in that the Memorandum advises a reviewer not to overlook candidates whose records may inadequately reflect their qualifications and ability. Thus, the Secretary's Memorandum does not pressure the RIF Board into making race or gender based retention decisions. It does not give minority or women officers an artificial benefit, nor burden white, male officers. The Memorandum simply attempts to secure a neutral, equitable process, and to identify for retention those officers who can best meet the needs of the Air Force.

There would be no constitutional violation if each Board Member was independently aware of discriminatory historical data. Nor is there a constitutional violation because the Secretary's Memorandum reminds Members of the RIF Board of possible past practices and circumscribed opportunity. The mention of possible past lack of opportunity does not rise to the level of an improper classification until it is combined with a direction to impose a benefit or burden based on that discrimination. In light of the multiple instructions commanding Board Members to execute their tasks fairly and to select the most qualified officers for retention, the language reminding Board Members of possible past negative practices should not be elevated above their simple purpose to remind Members of historical facts which may have im-

pacted certain officer's records regardless of their ability.

The plaintiffs point to the decision in *Baker v. United States*, 127 F.3d 1081 (Fed.Cir. 1997), *vacating and remanding on other grounds*, 34 Fed.Cl. 645 (1995), to urge a different reading of the Secretary's Memorandum of Instruction. The *Baker* case involved a Memorandum of Instruction to an Air Force Selective Early Retirement Board (SERB).[5] Although the *Baker* Memorandum is not identical to the one in the case currently before the court, both Memoranda contain the same language reminding Board Members of past practices that plaintiffs in this case allege to be constitutionally defective. In *Baker*, the Court of Federal Claims trial judge found that, on its face, the Memorandum "lack[ed] the other essential characteristics (requirements, quotas, goals, incentives) which transform the mere mention of race into a racial classification." *Baker v. United States*, 34 Fed.Cl. 645, 656 (1995), *vacated and remanded on other grounds*, 127 F.3d 1081 (Fed.Cir.1997).

The *Baker* trial court had admitted into evidence the declarations of two Air Force general officers and one colonel as evidence that the contested language did not impact the SERB's decisions. *Id.* at 652–53. The plaintiffs in *Baker* appealed to the United States Court of Appeals for the Federal Circuit, contesting the trial court's decision to admit the declarations of one of the general officers and of the colonel into evidence. *Baker v. United States*, 127 F.3d at 1086. Therefore, in *Baker*, the issues before the appeals court were evidentiary, including whether the trial court should have admitted the declarations. The Federal Circuit found that in reaching its decision, the trial court had relied, at least in part, on the declarations. *Id.* at 1088. The Federal Circuit also found that at least one of the declarants was "hardly reliable" and had no basis for his conclusions regarding what SERB Members did or did not do during their deliberations. *Id.* at 1087–88. Weeks after oral argument, the Department of Justice sent a letter to the

---

5. The actions to be reviewed in the case currently before the court are of a RIF Board, not a

SERB.

judges on the *Baker* Federal Circuit panel, withdrawing support for the general officer's declaration. *Id.* at 1088. The Federal Circuit found that this so weakened the government's case, and cast doubt on the colonel's declaration as well, that it vacated the trial court's opinion, remanded the case for further proceedings to determine the status of the other declaration and ordered another review of the Memorandum. *Id.* at 1088–89. Although the Federal Circuit opinion was focused on evidentiary issues which caused the remand to the trial court, in accompanying dicta, the Circuit Court characterized the Secretary's Memorandum in *Baker* as "permitt[ing], and even encourag[ing], if not actually command[ing] ... leveling through discounting." *Id.* at 1087. After receiving the case on remand, however, the trial court (and, therefore, also the appellate court) never reached an analysis on the merits of the allegedly offensive language in the Memorandum because the parties settled the case. *Baker v. United States*, No. 94–453C (Fed.Cl. Sept. 10, 1998).

Although the alleged offensive language reminding Board Members of possible past practices is the same in the instant case as in *Baker*, despite the dicta included in the Federal Circuit's opinion in *Baker*, this court has felt obliged to perform its own independent review for a number of reasons. First, the balance of the words in the Memorandum in *Baker* and the instant case are not the same. Moreover, the appellate court in *Baker* focused its attention on evidentiary matters, not on reviewing the words of the Memorandum of Instruction. In *Baker*, given the status of the case before it, and by its own description, the Federal Circuit did not perform an equal protection analysis. *Id.* at 1088. Furthermore, in *Baker*, the appellate court was reviewing a trial decision in which the trial court had taken into account: (1)

previous drafts of the Memorandum that included goals for selecting minority and female officers; (2) a Judge Advocate General (JAG) legal review stating its opinion that the charge required the Board to revise upward female and minority officers' scores if it believed there had been discrimination; (3) a report which followed the selection process stating that the president of the SERB reviewed the records of female and minority officers selected for retirement and caused an officer's record to be rescored if there was any doubt as to the "competitiveness" of the officer; and (4) two declarations from general officers, as well as a declaration from a colonel describing how the SERB interpreted the alleged offensive language. *Baker v. United States*, 127 F.3d at 1083–87. The *Baker* review panel specifically addressed the admissibility of two of the declarations admitted by the trial court. *Id.* at 1087. The unusual move by the government to withdraw support of one of the declarations during the appellate proceedings undermined the reliability of the other declarations and increased the skepticism of the appeals court. *Id.* at 1088. The Federal Circuit's opinion, therefore, focused on the ramifications of the government's letter withdrawing support for one of the general officer's declarations, and the letter's cryptic description of other evidence which may have come to light. *Id.*

No evidence beyond the face of the Secretary's Memorandum of Instruction has been presented to this trial court in the administrative record. Moreover, in the instant case, by agreement of the parties, the court restricts its analysis to a facial review of the Secretary's Memorandum of Instruction to determine whether the words of the Memorandum create a suspect discriminatory classification.[6]

Moreover, the Federal Circuit decision in *Baker* was issued on October 15, 1997. Sub-

---

**6.** At an oral argument on August 31, 1999, this court inquired of plaintiffs' attorney, "[b]ut on that complaint [the one before the court], there is a facial challenge and nothing else. Correct?" Plaintiffs' attorney answered, "[t]hat's correct, your honor." Although at the same hearing, plaintiffs' counsel suggested he might seek to amend plaintiffs' complaint after the administrative record was assembled and filed, no such amendment has been filed by the plaintiffs. Sim-

ilarly, at the November 8, 2000 oral argument in this case, plaintiffs stated that their allegations rest solely on a claim that the Secretary's Memorandum of Instruction is discriminatory on its face. At the oral argument, the plaintiffs did not argue that the Secretary's Memorandum was motivated by a race or gender based purpose or object, or was unexplainable on grounds other than race or gender.

sequently, several important and instructive cases from Circuit Courts of Appeals, discussed above, further construed *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158, and addressed the definition of a facial classification. For example, in 1998, the United States Court of Appeals for the First Circuit decided *Raso v. Lago*, 135 F.3d 11, the United States Court of Appeals for the Ninth Circuit decided *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, and the United States Court of Appeals for the District of Columbia Circuit decided *Lutheran Church–Missouri Synod v. FCC*, 154 F.3d 487. In 1999, the United States Court of Appeals for the Second Circuit decided *Hayden v. Nassau*, 180 F.3d 42, and the United States Court of Appeals for the Eleventh Circuit decided *Allen v. Alabama State Board of Education*, 164 F.3d 1347. The *Baker* panel did not have the benefit of these instructive Circuit Court decisions before it wrote the dicta concerning the effect of the language in the Secretary's Memorandum.

Based on the applicable precedent and persuasive discussions of the issues found in opinions of the United States Supreme Court and several Federal Circuit Courts of Appeals, and after analyzing the words of the Secretary's Memorandum of Instruction in the case at bar, even with the *Baker* panel's dicta in mind, this court finds that there is no suspect classification on the face of the Air Force Secretary's Memorandum of Instruction. The allegedly offensive language in the Memorandum does not confer a benefit to female or minority officers, nor does it place a burden on white, male officers, especially given the overriding context and goals of the memorandum, to secure equality for all officers in the selection process and to select the best officers for retention in the Air Force. In fact, requiring the RIF Board Members to artificially weight the records of female or minority officers would not achieve retention of the best qualified officers. On the face of the Memorandum, there is no reason to conclude that it sets out anything other than a fair and equitable process for the FY93 RIF Board to follow.[7] Mindful of the dicta included by the appellate panel in the *Baker* remand on evidentiary issues, this court is persuaded that the allegedly offensive language in the Secretary's Memorandum in the case before this court, which was also at issue in *Baker*, is not constitutionally defective on its face.

■ Because the court finds that the Secretary's Memorandum of Instruction did not contain a suspect classification violative of the Equal Protection Clause, it is reviewed under the rational basis level of scrutiny to determine whether the government action is related to a legitimate state interest. In this regard, the government's interest in the personnel composition of the Air Force is self

---

**7.** There also is a recently decided case in the United States Court of Federal Claims, *Christian v. United States*, 46 Fed.Cl. 793 (2000), interpreting a Memorandum of Instruction to a RIF Board issued by the Secretary of the Army. In *Christian*, the trial court found that the Board's actions were in violation of the Constitution. *Id.* at 814–15. The case currently before the court, however, is distinguishable from *Christian*. First, the *Christian* Memorandum, in and of itself, directed the Army RIF Board to consider race and gender as factors before completing the selection process. *Id.* at 803. In addition, the *Christian* Memorandum of Instruction created goals for the selection of minority and female officers. *Id.* at 803. While these goals were not defined as quotas, they certainly had that effect in *Christian*. If the goals for minority and female officers were not met, the *Christian* Board was directed to perform a reevaluation of minority and female officers. *Id.* In the case currently before this court, however, while the Memorandum issued by the Secretary of the Air Force

instructed Board Members to be sensitive to past history and opportunity in the context of an officer's overall record, it does not create any race or gender based goals. The Air Force Memorandum at issue in the case before this court includes no requirements to adjust the results of the selection at any stage during the process. Furthermore, in *Christian*, then Chief Judge Smith cited with approval the trial court's conclusion in *Baker v. United States* (Miller, J.) which found no constitutional violations based on the same allegedly offensive language as is at issue in the case at bar. *Christian v. United States*, 46 Fed.Cl. at 804. Additionally, the court in *Christian* cited the language in the *Baker* trial court and wrote that a charge to the Air Force Board to be sensitive to the possibility of past discrimination was not a racial classification in circumstances in which there were no numerically based goals for selecting female or minority officers. *Id.* (citing *Baker v. United States*, 34 Fed.Cl. at 656).

evident, important and legitimate. The expertise for making decisions furthering that interest lies with the military and not with the courts. *See Orloff v. Willoughby,* 345 U.S. at 93–94, 73 S.Ct. 534. The court finds that the Secretary's Memorandum was rationally related to furthering the government's interest in controlling the size and composition of the Air Force. The RIF Board selection process was, by the terms of the Secretary's Memorandum, designed to retain those officers who were best qualified to meet the overall needs of the Air Force.

At the oral argument on November 8, 2000, following a brief mention in defendant's "Motion for Leave to File Notice of Supplemental Authority," defendant cited *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) as important to defendant's case. In *Salerno,* five justices joined Chief Justice Rehnquist in upholding the constitutionality of a federal statute, and observed that:

> A facial challenge to a legislative Act, is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the … Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment. *Schall v. Martin,* [467 U.S. 253, 269 n. 18, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) ]. We think respondents have failed to shoulder their heavy burden to demonstrate that the Act is "facially" unconstitutional.

*United States v. Salerno,* 481 U.S. at 745, 107 S.Ct. 2095. The defendant argues that the plaintiffs in this case must similarly establish that no set of circumstances exists under which the Secretary's Memorandum would be valid.

The defendant failed to note that this particular language from *Salerno* subsequently was criticized by the plurality decision in the Supreme Court in *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999), in which the Court found a Chicago ordinance unconstitutionally vague. A footnote to an opinion by Justice Stevens, joined in by Justices Souter and Ginsburg, includes the following language:

> To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself …. We need not, however, resolve the viability of *Salerno's* dictum, because this case comes to us from a state—not a federal—court.

*City of Chicago v. Morales,* 527 U.S. at 55 n. 22, 119 S.Ct. 1849. Justices O'Connor, Kennedy, and Breyer concurred in the judgment, but did not concur in the portion of the opinion in which the *Salerno* case was criticized.

In a dissent, Justice Scalia responded in *City of Chicago* by endorsing and rearticulating the *Salerno* doctrine that facial challengers must establish no set of circumstances under which the act or action would be valid. *Id.* at 78–79, 81, 119 S.Ct. 1849. He also pointed out that the *Salerno* rule did not originate in the *Salerno* case, but that it had been previously explained in a line of prior opinions. *Id.* at 79, 119 S.Ct. 1849. Justice Scalia further noted that on "hot button social issues" the Supreme Court has created what he characterized as "entirely irrational exceptions." In a footnote to his dissent, Justice Scalia answered the plurality as follows:

> The plurality asserts that the *Salerno* standard for facial challenge "has never been the decisive factor in any decision of this Court." It means by that only this: in rejecting a facial challenge, the Court has never contented itself with identifying only one situation in which the challenged statute would be constitutional, but has mentioned several. But that is not at all remarkable, and casts no doubt upon the validity of the principle that *Salerno* and these many other cases enunciated.

*Id.* at 80 n. 3, 119 S.Ct. 1849. Justice Thomas and Chief Justice Rehnquist, dissenting in *City of Chicago,* agreed with Justice Scalia on the continued viability of the above-quoted language from *Salerno. Id.* at 98, 111, 119

S.Ct. 1849. Justice Breyer, in a separate concurrence with the judgment, but in which he did not concur with the part of the opinion which addressed *Salerno,* concluded:

> As I have said, I believe the ordinance violates the Constitution because it delegates too much discretion to a police officer to decide whom to order to move on, and in what circumstances. And I see no way to distinguish in the ordinance's terms between one application of that discretion and another. The ordinance is unconstitutional, not because a policeman applied his discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in every case. And if every application of the ordinance represents an exercise of unlimited discretion, then the ordinance is invalid in all its applications.

*Id.* at 71, 119 S.Ct. 1849. Justice O'Connor's position on the language in *Salerno* is less clear. In *City of Chicago,* she states that she expresses no opinion on the other issues addressed by the plurality, which appears to include *Salerno. Id.* at 67, 119 S.Ct. 1849. Nor can Justice Kennedy's position be easily discerned from his brief concurring opinion which does not address the issue. *Id.* at 69, 119 S.Ct. 1849. Thus, in *City of Chicago,* only three justices, Scalia, Thomas and Rehnquist, appear to support the above-quoted language from *Salerno,* and only three justices, Stevens, Souter, and Ginsburg clearly offer opposition to the *Salerno* language. Even the latter justices, however, although they raise the issue, stop short of explicitly resolving the viability of *Salerno's* direction. *Id.* at 55 n. 22, 119 S.Ct. 1849.

The court notes, moreover, that the *Salerno* "test" was not discussed by the Supreme Court in key equal protection cases such as *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158, *United States v. Virginia,* 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735, or *Hunt v. Cromartie,* 526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731, perhaps calling into question the applica-

tion of the *Salerno* test in equal protection cases. The plaintiffs in both *Virginia* and *Adarand* alleged that the government actions in question gave rise to a facial suspect classification, yet in neither case did the court require the plaintiff to prove that the government action was unconstitutional in all circumstances. *See United States v. Virginia,* 518 U.S. at 531, 116 S.Ct. 2264; *Adarand v. Pena,* 515 U.S. at 223, 115 S.Ct. 2097. Neither party has cited to cases in which the *Salerno* language in question has been applied in the context of an equal protection challenge.[8]

The court need not decide, however, whether the rule in *Salerno* is still viable or, if viable, whether it applies to equal protection challenges. If the test in *Salerno,* is alive, and if it applies to the instant case, the court's conclusion that the text of the Memorandum is facially neutral and that the government action was rationally related to a legitimate state interest would foreclose any possibility that plaintiffs' could meet the *Salerno* burden. The court's conclusions result in a finding that, based upon the record in this case, the Memorandum of Instruction was constitutional as applied to plaintiffs. If *Salerno* does not apply, either because the doctrine is no longer viable or because it is not easily applicable to equal protection analysis, the court's conclusion remains the same. The Secretary's Memorandum of Instruction is facially neutral and rationally related to a legitimate government interest. Thus, on its face, the Secretary's Memorandum does not violate constitutional guarantees.

■ Plaintiffs also argue that the Secretary's Memorandum included a racial or gender classification because it instructed the FY93 RIF Board to "prepare for review by the Secretary and the Chief of Staff, a report of minority and female officer selections as compared to the selection rates for all officers considered by the Board." This argument also fails. "Courts have not found requirements to collect data about the racial

---

8. Two cases which did cite *Salerno* in an equal protection context are *Giusto v. INS,* 9 F.3d 8, 10 (2d Cir.1993) and *Kai Wu Chan v. Reno,* No. 95 Civ. 2586, 1997 WL 122783, at *14 (S.D.N.Y. Mar. 17, 1997). Both cite *Salerno* in determin-

ing whether a law discriminating against a nonsuspect class passed the rational basis test. *Giusto v. INS,* 9 F.3d at 10; *Kai Wu Chan v. Reno,* No. 95 Civ. 2586, 1997 WL 122783, at *14. at 320.

and gender make-up of a workforce to violate the Constitution." *Sussman v. Tanoue,* 39 F.Supp.2d 13, 25 (D.D.C.1999) (citing *Caulfield v. Bd. of Educ.,* 583 F.2d 605, 611–12 (2d Cir.1978); *United States v. New Hampshire,* 539 F.2d 277, 280 (1st Cir.), *cert. denied,* 429 U.S. 1023, 97 S.Ct. 641, 50 L.Ed.2d 625 (1976)). Furthermore, the "possible and purely hypothetical misuse of data does not require the banning of reasonable procedures to acquire such data. Statistical information as such is a rather neutral entity which only becomes meaningful when it is interpreted." *United States v. New Hampshire,* 539 F.2d at 280.[9] The simple collection of data does not place a burden or benefit on a single class of persons and, therefore, cannot be considered a suspect classification. *See Honadle v. Univ. of Vermont,* 56 F.Supp.2d 419, 428 (1999).

In addition, the language of the Secretary's Memorandum directs the Board to compile a report regarding "all officers considered by the Board." The use of the past tense "considered" in the Memorandum of Instruction indicates that the report was to be prepared after the completion of the review of all eligible officers' records. There is no instruction in the Secretary's Memorandum to keep a running tally of the race or gender of officers who were selected. Moreover, the Memorandum did not instruct the Board Members to make any adjustments to their selections following the analysis and preparation of the report. Therefore, the report had no effect on the process of selecting officers to be separated. Because the order to compile a report only required the gathering of information and did not affect the RIF process, it did not bestow a benefit or burden based on a suspect class. The requirement to prepare a "report of minority and female officer selections as compared to the selection rates for all officers considered by the Board" does not, in and of itself, establish that the FY93 RIF Board was directed to use improper minority or gender based selection criteria.

## CONCLUSION

The plain meaning of the Secretary's Memorandum of Instruction is to guarantee equal treatment and opportunity to all those subject to review by the FY93 RIF Board, including white male, minority and women officers. The Secretary's Memorandum does not instruct the Board to use racial and/or gender classifications in the selection process. When read in context with the stated goals of the Secretary's Memorandum of Instruction, to guarantee equal opportunity to all officers during the RIF process, and to select for retention those officers best suited to perform according to the overall needs of the Air Force, the words referring specifically to women and minorities simply remind the Board Members that, due to historical conditions, an officer's record may not fully reflect his or her actual ability from a total career perspective. The words of the Secretary's Memorandum are neutral on their face, and the Memorandum should not be subject to a heightened scrutiny of review by this court. Equality is the stated goal. It would be inappropriate and unwise to ban the mere mention of race, gender or reference to historical events. Nor should such discussion be considered offensive or violative of constitutional guarantees. Furthermore, the Secretary's Memorandum of Instruction, and the directions included therein, bear a rational relationship to a legitimate government interest. The plaintiffs who joined in the above captioned law suit were not deprived of equal protection under the law. The defendant's motion for judgment upon the administrative record is, hereby, **GRANTED,** and the plaintiffs' cross-motion is **DENIED.**

**IT IS SO ORDERED.**

---

9. Plaintiffs have attempted to distinguish *New Hampshire* on the basis that it dealt with the Fourteenth Amendment, not the Fifth Amendment. This distinction is rejected. The *New Hampshire* case is cited here for the proposition that mere statistical gathering, without more, is harmless in any arena until it is interpreted and acted upon, at which time such actions are subject to law and judicial scrutiny. *United States v. New Hampshire,* 539 F.2d at 280.